25 P.(2d) 211

STATE v. WELCH.

No. 3808.

Supreme Court of New Mexico.

Sept. 29, 1933.

Carl A. Hatch, of Clovis, Caswell S. Neal, of Carlsbad, and George A. Threlkeld, of Roswell, for appellant.

E. K. Neumann, Atty. Gen., and Quincy D. Adams, Asst. Atty. Gen., for the State.

WATSON, Chief Justice.

Appellant was convicted of murder in the second degree for the killing of Rufe Dunnahoo. The trial occurred in Eddy county on change of venue from Chaves county. The

information was in three counts, charging, respectively, the two degrees of murder and voluntary manslaughter.

The deceased was a deputy sheriff. Accompanied by Sheriff Peck and Deputy Herbst, he was engaged in investigating the supposed larceny of certain parts or accessories of an automobile which had recently been substantially destroyed by fire and left near the highway. The homicide occurred while the party, having no search warrant and no body warrant, was engaged in searching appellant's dwelling house, and in making seizure of certain of the missing articles.

The possible theories of guilt will be disclosed from a review of the testimony of Sheriff Peck, who fully and clearly narrated the circumstances as a witness for the state. The three officers, according to this witness, drove to the scene of the homicide in a car. They had no warrant for appellant or to search his premises. Without alighting they inquired for appellant, who "spoke up and said, 'Here I am.'" Deputy Herbst said, "I am looking for some parts off of a car, a license plate and some parts off of a car." Appellant said, "The license plates are here." The officers then got out of the car and appellant said, "They should be in this truck bed." The three officers and appellant went to the truck bed and found nothing. While at the truck the sheriff said, "My name is Peck. I am the sheriff. Do you object to me searching your place?" Appellant replied, "No, I will help you."

Leaving the truck, the party scattered, continuing the search. Presently the deceased came out of the house, saying to appellant, "Here is the license plates. You might as well come across with the other things. We are going to take you with us." Appellant replied, "All right, let's go." Deceased turned back to the house, and the sheriff followed, appellant still being outside. The sheriff went into the east room, there found two automobile light globes in a sack hanging on the wall, took them to his car, and returned to the east room. The deceased was then in the middle room and the sheriff said to him, "I found the lights." Appellant, with a gun in his hand, encountered the sheriff at the door between the east and middle rooms and said, "Don't come in here, God damn you, I will kill you." Then: "I told him he was foolish, that this didn't amount to anything. He says, 'You will disturb my baby.' I says, 'I will not disturb your baby, you are the only one that is making any disturbance.' He says, 'You haven't a search warrant.' I says, 'I don't need a search warrant, you gave me permission to search your house, search your place.' I says, "I have a search warrant, it is for Mr. Buffington.' Mr. Welch was backing from us all the time. By that time Mr. Dunnahoo had come up to Mr. Welch on his left. I was on his right. I had got Mr. Welch's right arm and I asked Mr. Welch to give his gun to the lady. Mr. Welch pushed Mr. Dunnahoo over on the bed, fell on top of him, and me on top of Mr. Welch. * * * Shots were fired. Mr. Welch says,

'Get up.' I did. Mr. Welch says, 'Get out.' I backed out of the room. His gun was in his hand by his side pointed at me."

On cross-examination the witness said that he did not see appellant when he got his pistol; that, when ordering him out, appellant pointed the pistol at him, not at Dunnahoo; that appellant backed away as he advanced; that he grabbed appellant by the right arm; that appellant at that time had the pistol down, not pointing; that the deceased then got hold of appellant's left arm; that the witness "intended to take the pistol away from, was trying to take it away from him."

Deputy Herbst, who also testified, did not actually witness the fatal struggle. His testimony is less complete than that of the sheriff. He adds one fact: That when the deceased first entered the house, appellant asked him to be careful not to disturb his sick baby.

On the other hand, the possible defenses will be disclosed by a review of appellant's testimony. On the day of the homicide appellant's baby was very ill and its death seemed imminent. Appellant's wife was pregnant, "was in bad condition. She had been sitting up (with the sick child) and she had been having fainting spells. Then she was afraid, and I was afraid, of a miscarriage." Appellant was "behind in the crop," had been plowing every day, and sitting up nights with the sick child. He was tired, worried, and nervous. He had taken the parts from the destroyed car by way of salvage, intending to return them to the owner.

When the three officers drove up in the car and inquired for him he said, "Here I am." The deceased told him that "Some car parts, license, accessories, was missing off the car that burned about two weeks ago." Appellant replied, "They are here somewheres, I think the license plates are in this truck bed, I had put them there, somewhere, it had been, I thought it was yet." Then: "Two of the men got out of the car, started out. I don't know whether one of them came on the way or not, but John (Sheriff Peck) come to the east side, the south side, and went to looking. He (Sheriff Peck) started looking on the south end, and came around on the other side. I was sitting on the north end. He came where I was, and he told me about the car license and accessories that had been taken off the car. He said that the car license and accessories had been taken off the car about two weeks. I told him the license plate was around there, I guessed it was around there somewhere, if we didn't find it in there I would be responsible for it. A few minutes later, Mr. Herbst at that time went out looking, got out of the car, I don't know when he got out, and directly Mr. Dunnahoo came out from somewhere, I don't know where, and says, 'Here's the car license.' Says, 'Now, you may as well tell where the other is. If you don't I am going to send you to jail.' I says, 'All right.' When and where Mr. Peck went I don't know. Directly Mr. Dunnahoo disappeared again and I didn't know where he was at. I went to the north window and looked in the house there and he was there by the side of the bed where my sick baby

was lying and my wife sitting there crying. He was down looking and the bed was shaking, and I told my wife and children to get away, and I swung back around to the east side. He (evidently meaning Sheriff Peck) was coming in the west door. Then I came in through the door there and my wife was in there crying and I told them they was in there without a search warrant, I was going to see if I couldn't get them out, try to get them out. I went through that room, in about half way, there is a door goes into this middle room. I went through that middle room, I walked back in the southeast corner of the house. I had a pistol hanging up in there. I got that. By that time, well, I said they was in there without a search warrant and I went there and Mr. Dunnahoo had started toward me in there, and I don't know where Peck came from, and he said 'I have a search warrant.' I said, 'Let's see it,' and he pulled out a paper about like that and stuck it back in and I said 'Let's see it,' and he never answered. He kept on coming towards me. I was standing by the side of the wife, at the foot of the bed, the baby was lying on the side. I stepped back toward the bed. They kept on coming. I stood there, they got me by each hand, like that, he and Mr. Dunnahoo, and he told me to hand my wife the gun. I made an attempt, we had a scuffle, and all three of us went on the bed, and Mr. Dunnahoo lay on the bed and me, with Peck across me. All three of us had hold of the gun, Mr. Dunnahoo had hold of the barrell of the gun, Mr. Peck had hold back of my hand somewhere, and in the scuffle over the gun, the gun fired."

Appellant did not pull the trigger of the gun when it fired, did not try to shoot it, and did not intend to kill the officers. When appellant saw the deceased pulling things out from under the bed and shaking the bed, he was frightened and mad and went and got the gun "just to protect" his "wife and family and baby" and "did not intend, never intended," to kill the officers with it. Immediately after the homicide the sheriff told appellant, "I have no search warrant on you, I have a search warrant on Mr. Buffington." Until after the homicide no one had attempted to arrest appellant, and he had given none of the officers any permission to search his house. He did not, in ordering the officers out, make the threat, "Don't come in here, God damn you, I will kill you." He said to them, "Please get out." He denied that the sheriff had asked him, "Do you object to my searching the place?" or that he replied "No, I will help you."

All three counts of the information and their stated degrees of homicide were submitted to the jury. By the first nine paragraphs of the charge the jury was instructed generally and abstractly regarding the two degrees of murder and the distinction between them. Paragraphs 10 and 11 follow:

"10. The court further instructs you that a homicide is excusable when committed by accident or misfortune, or in the doing of any lawful act by lawful means, with usual and ordinary caution, and without any unlawful

intent, or by accident or misfortune, in the heat of passion, upon any sudden and sufficient provocation; and upon sudden combat, without any undue advantage being taken, and without any dangerous weapons being used, and not done in a cruel and unusual manner. And if you believe from the evidence that the killing in this case, if you find there was one, was committed under such circumstances as to constitute an accident or misfortune within the definitions here given, then such killing would be excusable and you should find the defendant not guilty.

"11. If you believe from the evidence or have a reasonable doubt that while the deceased and his companion were attempting to search the dwelling place of the defendant, the defendant in heat of passion caused by such search of his dwelling, armed himself and while the defendant was handling said pistol with usual and ordinary caution and circumspection, a struggle ensued between the defendant, the deceased, and his companion, and in some accidental manner said pistol was discharged, causing the death of the deceased, and that such discharge was without the intent of the defendant, and without any intention on defendant's part to shoot or injure the deceased, then you should acquit the defendant."

Paragraphs 12 and 13 expound voluntary manslaughter in the abstract.

Paragraphs 14 and 15 follow:

"14. You are instructed that if you find from the evidence and beyond a reasonable doubt that the officers, John C. Peck, the sheriff, the deceased Rufus J. Dunnahoo, deputy sheriff, and deputy sheriff Herbst, after disclosing their identity, and the purpose for which they were there, stated their desire to search defendant's place, and that the defendant gave his consent to the search, if he did, that fact under the law constituted a consent and permission that the search could be made, and that subsequent thereto such officers had full legal authority to make a search of the premises of the defendant.

"15. It is a felony under the law of this state for any person to steal from an automobile an accessory or equipment thereof, and the question arises in this case, whether or not the Sheriff, John C. Peck, and his deputy, Rufe Dunnahoo, the deceased, had reasonable ground to believe that the defendant had committed such a felony at the time said deceased was killed.

"If you find and believe from the evidence that said officers had been reliably informed that certain accessories or equipment consisting of license plates and headlights, had been stolen from the car of one Powell at some time preceding the killing, and that similar accessories or equipment were discovered by said officers on the premises of the defendant immediately prior to the killing, then and in that event there would be probable cause for such officers to believe that a felony had been committed; and if you further find and believe from all the facts and circumstances in evidence that said officers actually believed such felony had been committed and that they had reasonable

grounds to suspect the defendant to be the person who had committed it, it was their duty then and there to arrest the defendant, although holding no warrant or other legal process commanding his arrest.

"If you find and believe from the evidence, and beyond a reasonable doubt, that said officers had then and there attempted to take the defendant into custody under circumstances rendering it their duty so to do, as explained above in this instruction, and that, in pursuance of such attempt, they seized the arms or body of the defendant with their hands, and that in resistance of such attempted arrest, the defendant shot and killed the said Rufus J. Dunnahoo, the defendant would be guilty of murder in the first or second degree, as elsewhere explained in these instructions and you will so find.

"The law seeks to protect the officer in the discharge of his duties, and it is a duty encumbent upon every citizen to submit to a lawful arrest."

We have inserted above each paragraph of the charge in which there was any attempt to apply the law to the evidence in the case, or to submit the conflicting theories.

It will at once strike the professional mind that whether appellant is guilty at all, and if so, the degree of criminality depends upon a correct decision of certain issues of fact; and that the jury, to be in a position to render a general verdict, needed correct and clear instructions regarding the law of search and seizure, of arrest, and of defense of habitation. In no class of criminal cases are correct instructions more essential. People v. Hubbard, 64 Cal. App. 27, 220 P. 315; State v. Bradley, 126 S. C. 528, 120 S. E. 240.

 Appellant challenges the correctness of the abstract instruction not here inserted, in which the court explained the distinction between the two degrees of murder. It will be unnecessary to go into that. This court considered it with great care in State v. Smith, 26 N. M. 482, 194 P. 869. See, also, State v. Kile, 29 N. M. 55, 218 P. 347. For an additional valuable exposition, see Winton v. State, 151 Tenn. 177, 268 S. W. 633.

Instruction 10 is a somewhat inaccurate rescript of the statute on excusable homicide, 1929 Comp. St. § 35-319. It is in the abstract. The attempt is made by instruction 11 to apply the statute to the evidence in the case. It is contended that it erroneously limits the defense of excusable homicide, as appellant was entitled to have it submitted.

First to be noticed is a curious intermixing of the statutory specifications. The statute protects appellant if he committed the homicide by accident or misfortune (a) in "doing any other lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent," or (b) "in the heat of passion, upon any sudden and sufficient provocation"; thus giving him two independent defenses. State v. Bailey, 27 N. M. 145, 198 P. 529, 534. The instruction cumulates these into a single defense. Appellant must have armed himself in heat of passion, and have immediately cooled enough to handle the pis-

tol "with usual and ordinary caution and circumspection."

This was a misstatement of law. The jury might have found appellant to have armed himself in heat of passion and then have refused to excuse the homicide because he failed to handle the pistol "with usual and ordinary caution and circumspection"; the last word being added to the care required by the statute.

The particular contention made is that, by its requirement of heat of passion, the instruction excluded defense (a). Obviously appellant was so deprived. The question is whether he was entitled to it.

It is an admitted fact that the homicide occurred in appellant's habitation, in which were his wife and child. Admittedly the officers were armed with no process entitling them to enter. Whether there by express or implied license is in dispute. But all agree that they were ordered out.

It is not to be doubted that appellant, according to his theory, was "doing a lawful act" in protecting his habitation against invasion by ordering the intruders to leave and by employing force to that end. Did he employ "lawful means"?

Defense of habitation in many circumstances involves the right to take life if necessary. 1 Mitchie on Homicide, § 123. Some courts adhere strictly to the old maxim that "An Englishman's house is his castle." Other courts would not justify the taking of life unless the intrusion involved a threat or reasonable apprehension of a felony to be committed within the habitation. We have not come upon any case where the justifying apprehension was, as here, that the intrusion involved danger to sick members of the family. We are not prepared to say, as matter of law, and need not decide, that such apprehension as appellant claims to have felt here is not equivalent to apprehension of robbery or rape.

Under appellant's theory that the homicide was unintentional, the right to take life is not here directly involved. It is his lesser right to arm himself. Undoubtedly, there are circumstances justifying one in arming for an anticipated eventuality, though what actually followed would not justify the taking of life. The evidence in the present case we think required that this question be resolved by the jury, under proper instructions. People v. Hubbard, supra; People v. Williamson, 6 Cal. App. 336, 92 P. 313; Lewis v. Commonwealth, 140 Ky. 652, 131 S. W. 517; Ayers v. State, 60 Miss. 709; Brown v. State, 87 Tex. Cr. R. 261, 222 S. W. 252. In State v. Bailey, supra, speaking of one's right to expel an intruder, we said: "He may take an affirmative and aggressive attitude, and if a conflict ensues, and the intruder endangers his life, or places him in great bodily harm, he may slay the intruder." One may lawfully arm in reasonable anticipation of a dangerous attack. State v. Burkett, 30 N. M. 382, 234 P. 681.

Assuming appellant to have been doing a lawful act by lawful means, the next require-

ment of the statute is that he proceed "with usual and ordinary caution." It chances in this case, however, that his failure so to proceed, being negligence, would not defeat his defense. The criminality attaching to the "commission of a lawful act which might produce death, * * * without due caution and circumspection" is involuntary manslaughter (1929 Comp. St. § 35-305); an offense not charged in the information, of which appellant could not have been found guilty, and which was not submitted to the jury.

True, appellant testified that when he saw the deceased pulling things from under and shaking the bed on which his wife and child lay, he became frightened and mad, and went and got his gun. The jury might have legitimately inferred that he acted in heat of passion. The instruction perhaps permitted an inference that "such search" was sufficient provocation.

But the jury need not, it evidently did not, believe appellant's fear and anger to have been of a degree to be termed "heat of passion." It should have been directed in such event to consider the contention that appellant was in the performance of a lawful act by lawful means. Such theory was excluded by making heat of passion essential to the defense.

We are constrained to hold that appellant's objection to the instruction was well taken, and that the defect constitutes reversible error.

We might stop here. However, in anticipation of another trial, we deem it proper to make some observations as to the other quoted instructions.

From paragraph 14 the jury might well infer that if appellant had once given permission to search his habitation, he could not thereafter revoke his consent, though the search took on a character reasonably justifying apprehension of danger to sick members of the family. We have not fully considered this question. Our impression is that such permission as, according to the state's theory, was given implied a reasonable search with due consideration for appellant's family.

In paragraph 15 the court built up, step by step, a theory of murder, thus: First. The larceny of two headlights, two license plate brackets, and perhaps a horn, accessories of unascertained, certainly not great, value, attached to a destroyed Ford car, is a felony. Second. If the officers were reliably informed of the larceny and found similar articles on appellant's premises, they had probable cause to believe a felonious larceny to have been committed, and appellant to be the thief. Third. Having such probable cause, if they did so believe, it was their duty to arrest appellant, though having no warrant. Fourth. If the officers attempted an arrest and, in resistance, appellant killed the deceased, the crime was murder.

The first of these propositions is based upon 1929 Comp. St. § 35-1611, defining "the

crime of larceny from an automobile." This being a penal statute, and to be strictly construed, it may well be argued, though it is unnecessary here to decide, that it is not applicable to the larceny of parts or accessories from what, once an automobile, has been so far destroyed as no longer to be considered such.

The second proposition is challenged because of the use of the expression "similar articles." This, if technically incorrect, could not have been prejudicial in view of appellant's admission that the articles found on his premises were the missing parts.

██ By the fourth proposition it is laid down that a homicide occurring in resistance to lawful arrest is murder. It eliminates intent and malice as essentials of murder in the second degree, of which appellant has been convicted; substituting for them the fact of resistance. The correctness of this is dependent upon the homicide statutes.

We find it enacted that "All murder * * * which is committed in the perpetration of or attempt to perpetrate any felony * * * shall· be deemed murder in the first degree. * * *" 1929 Comp. St. § 35-304. Substituting the statutory definition of murder, this would read: "All unlawful killing of a human being, with malice aforethought * * * which is committed in the perpetration of or attempt to perpetrate any felony * * * shall be deemed murder· in the first degree. * * *" On its face, the statute does not eliminate malice. However, back of the statute is the common-law rule that "felo-nious intention, as an element of the homicide, is supplied by the intention to do the unlawful act of which the homicide is the consequence." 13 R. C. L. "Homicide," § 147. 29 C. J. "Homicide," § 70. So "murder," as used in the statute, includes those wherein the malice aforethought is supplied by a collateral unlawful intent; or, to put it otherwise, "murder" here means "homicide." Some liberty is thus taken with the language, but it is the interpretation this court has adopted. State v. Smelcer, 30 N. M. 122, 228 P. 183, 184.

It was left to the jury to determine the degree of murder "as elsewhere explained in these instructions." This was error. If the perpetration of a felony be relied upon as supplying the malice aforethought, the result cannot be murder in the second degree. The statute makes it murder in the first degree. In this case the jury, if it substituted the unlawful resistance for malice aforethought, was permitted to convict, as it did, of murder in the second degree, unless it should find the existence of that degree of deliberation constituting the intensified malice of murder in the first degree. But the statute itself supplies the intensified malice.

The instruction does not state, but necessarily presupposes, that appellant's unlawful resistance was a felony. This is also to be tested by the statute.

If the deceased had been engaged in serving or attempting to serve or execute any process, rule or order of court, or judicial writ, the statutory penalty is sufficient to

bring the offense within the grade of felony. Id. §§ 35-2705, 35-103, 35-105. In this case, however, the officers were not so engaged. Assuming the lawfulness of the attempted arrest, the deceased was merely engaged "in the execution of his office." The offense of resisting under such circumstances is defined by section 35-2706, and is clearly a misdemeanor.

The unlawful act being a misdemeanor, the consequences are quite different. The homicide becomes involuntary manslaughter. Id. § 35-305.

We are not unaware of the holding in State v. Smelcer, supra, that the "resistance of the sheriff" in that case was a felony. We think the ruling must have been inadvertent; presuming that the court did not give careful consideration to the statutes just cited. It would require considerable liberality of construction of a criminal statute to hold section 35-2705 applicable where the officer was not armed with process; particularly in view of the section following, making resistance in general a lesser offense. The matter was of slight importance in the Smelcer Case, as the opinion discloses.

Nor do we overlook a possible question as to whether resistance within the meaning of section 35-2705 could be deemed a felony until after conviction and the exercise of the court's discretion in imposing sentence. The two possible views as to this were referred to in State v. Tinsley, 34 N. M. 458, 283 P. 907, leaving in doubt the correctness of the view taken by the territorial Supreme Court in Territory v. Gonzales, 14 N. M. 31, 89 P. 250.

This question need not be decided now, since appellant cannot again be tried for murder in the first degree, and, if convicted of murder in the second degree, it must be upon the theory that the homicide was committed with malice aforethought, not merely that it was committed in the course of perpetrating a felony.

For the error in unduly limiting appellant's defense of excusable homicide, as herein pointed out, the judgment will be reversed and the cause remanded for new trial.

It is so ordered.

SADLER, HUDSPETH, BICKLEY, and ZINN, JJ., concur.