46 P.(2d) 658

**STATE v. BENTFORD.**

No. 4053.

Supreme Court of New Mexico.

June 24, 1935.

Alvan N. White, of Silver City, for appellant.

Frank H. Patton, Atty. Gen., and Quincy D. Adams, Asst. Atty. Gen., for the State.

ZINN, Justice.

Alford Bentford was convicted of the murder of Gussie Thomas, by means of strangling and suffocation. The verdict was murder in the first degree. The case is here on appeal.

The evidence supporting the conviction is circumstantial. The incriminating facts are as follows:

A pair of Bentford's overalls and a quilt from the bed in his room, upon examination, showed human blood. Gussie Thomas disappeared some time between dusk Saturday and Monday morning. Bentford was seen Sunday morning on the porch of the house where she was living. While in jail, Bentford stated to a number of people that he had dreams. In these alleged dreams, as related by Bentford, he claims he saw Jim Noble, with whom deceased had been living, though not married, kill deceased after a quarrel and throw her body in a mining shaft or some well. Bentford described the well wherein the body was subsequently found. He described in detail the manner in which the body was clothed; how she was hit with an iron; saw the alleged assailant in the dream tie a rag around the head of deceased; and saw many other details relating to the murder of deceased and disposition of her body. These details could only have been known to the murderer or an eyewitness. The jury was not impressed with the idea that the detailed narration of the crime came to appellant as visions while asleep. Appellant did not take the stand to refute any of the testimony.

Bentford, handcuffed, in custody of a deputy sheriff, was taken to the well described by him. Without the aid of mirror or reflector to enable him to look into the well, appellant made the statement that deceased was there and that he could see her body. The state's witness testified that they could not, with the naked eye, see the body in the well. When the body was brought up from the well, she was dressed and tied in the manner related by Bentford as allegedly envisioned by him in his dreams.

Appellant makes point of numerous claimed errors, which we have considered. We are not impressed with some and do not consider a decision or discussion of others essential at this time, in view of our disposition of this case.

The seventh error complained of by appellant is the failure of the court to submit to the jury murder in the second degree. The charge of murder was laid in the common-law form, and the court's instructions to the jury disclose that the case was *not* tried upon the theory that the murder was committed by means of torture or in the perpetration of or attempt to perpetrate a felony.

In the case of State v. Welch, 37 N. M. 549, 25 P.(2d) 211, 216, appellant was convicted of murder in the second degree. The theory of the prosecution was that the appellant killed the deceased, an officer, while resisting an attempted arrest, which resistance the state contended was a felony. Under Comp. St. 1929, § 35-304, all murder which is committed in the p   )etration of or attempt to perpetrate any felony shall be deemed murder in the first degree. On the

theory of the prosecution that the murder was committed in the perpetration of a felony, we held the verdict erroneous. We said: "On its face, the statute does not eliminate · malice. However, back of the statute is the common-law rule that 'felonious intention, as an element of the homicide, is supplied by the intention to do the unlawful act of which the homicide is the consequence.' * * * If the perpetration of a felony be relied upon as supplying the malice aforethought, the result cannot be murder in the second degree. The statute makes it murder in the first degree."

In State v. Reed et al., 39 N. M. 44, 39 P.(2d) 1005, 1006, appellants were put to trial on an information charging murder in the first degree, and were convicted of murder in the second degree. The second count upon which the conviction was had predicated murder in the first degree upon the theory that appellants took deceased into their hands, tied and bound him, and placed him near and onto a fire, and set fire to his clothing and body, thereby inflicting mortal burns from which he died.

In the case of Territory v. Vialpando, 8 N. M. 211, 42 P. 64, 65, the charge was that Jesus · Vialpando and Feliciano Chavez, "* * * then and there, * * * did take * * * Tomas Martinez into both the hands of them, the said Jesus Vialpando and Feliciano Chavez, and did * * * cast, throw, and push the said Tomas Martinez into a certain fire then and there burning, * * * and by means of the flames thereof, upon the said Tomas Martinez, on his breast, belly, arms, legs, head, neck, and other parts of the body, divers mortal burns, sores, and wounds, of which said mortal burns, sores, and wounds the said Tomas Martinez then and there instantly died."

The territorial Supreme Court, in the Vialpando Case, supra, said: "The facts set forth, we think, necessarily import torture, —a recital of facts from which the law draws the conclusion of torture; and the omission of the statutory word 'torture' cannot, we think, vitiate the indictment."

It was on the second count in the case of State v. Reed et al., supra, that the case went to the jury. From the charge and proof on the second count, we concluded as a matter of law that the theory of the prosecution was "murder * * * perpetrated by means of * * * torture," as in the Vialpando Case. Comp. St. 1929, § 35-304, conclusively makes murder by torture first-degree murder. The conviction of murder in the second degree could therefore not be upheld.

We recognize no distinction between State v. Reed et al., supra, and Territory v. Vialpando, supra. In the Vialpando Case the jury had returned a verdict of guilty "as charged in the indictment." The trial court as a matter of law construed this as a verdict of murder in the first degree, and imposed sentence accordingly. The question before the territorial Supreme Court was whether the trial court correctly inter-

pretend the *allegations of the indictment* as charging murder by torture. It held that such allegations did charge murder by torture, and that the verdict was correctly appraised as one of murder in the first degree.

In the Reed Case, it was for us to say whether the trial court erred in *charging the jury* that a death designedly accomplished by practically the same means employed in the Vialpando Case presented any other theory than that of death by torture. We held that it did not, and consequently the trial court erred in submitting second degree.

We thus held as a matter of law that death designedly accomplished by the means charged in the indictment and set out in the instructions presented a case of murder by torture. In so deciding in the Reed Case, the majority felt that it was simply following the Vialpando Case in holding that reasonable minds could not differ on the subject, nor draw any other conclusion. We still do not doubt the correctness of that view.

But if error so to have concluded in the Reed Case, which we in no manner concede, it would be doubly so to appraise the act set out in the instructions in the case at bar as presenting a case of death by torture as a matter of law or fact. Indeed, we think "torture" as contemplated by the statute carries with it the idea of causing undue and unnecessary pain and suffering incident to the death intended, inflicted for the purpose of satisfying some spirit of revenge or other unnatural and inhuman instinct. That idea was pronouncedly present in the Reed Case, as submitted to the jury, and, although death occasioned in the manner supposed in the charge in the case at bar would be atrocious, we are unable to see in it the "torture death" contemplated by the statute.

We pointed out in the case of State v. Reed et al., supra, and in the case of State v. Welch, supra, citing other cases, that in this jurisdiction the statute, Comp. St. 1929, § 35-304, descends to particulars and prescribes that certain kinds of murder shall be murder in the first degree. The means employed to effect the taking of a human life, as, for example, poison or torture, supplies the intensified or express malice and the deliberation necessarily required to raise a homicide to murder in the first degree. In a case of murder by torture or poison, there is nothing for the jury to speculate about, because the trial court can say as a matter of law that the means employed necessarily and conclusively raise the crime to murder in the first degree. However, where the question of malice or deliberation must be left for the determination of the jury as a question of fact, then both degrees must be submitted. It is the province of the jury to determine whether the evidence discloses intensified or implied malice. The statute supplies intensified malice and deliberation where the murder is committed by poison, torture, lying in wait, or in the

perpetration or attempt to perpetrate a felony, or perpetrated by any act greatly dangerous to the lives of others, and indicating a depraved mind regardless of human life. Where the jury must conclude from the facts where the murder was a willful, deliberate, premeditated killing, perpetrated from a deliberate and premeditated design unlawfully and maliciously to effect the death of a human being, then the court should instruct in both first and second degrees. In the ordinary homicide case, evidence which will satisfy the requirements of murder in the first degree will sustain a conviction of murder in the second degree. State v. Reed et al., supra. The jury must determine from the evidence whether the murder falls within that classification which the statute describes as a willful, deliberate, premeditated killing, perpetrated from a deliberate and premeditated design unlawfully and maliciously to effect the death of a human being, or is murder in the second degree. The jury must, from the facts, satisfy itself beyond a reasonable doubt that the murder is of one kind or another, and the court must instruct accordingly.

It is conceivable that where an accused is charged with murder committed while lying in wait, the jury might find that though the murder was committed, the lying in wait was not necessarily in conjunction with the crime charged, and might find the accused guilty of murder in the second degree. The same might be true of a murder committed while perpetrating or attempting to perpetrate a felony.

Can it be supposed, however, of a case where murder is committed by means of poison or torture, that such murder was not the result of such act?

The means employed conclusively supply the intensified malice and deliberation which makes it first-degree murder and nothing else. The statute has supplied them. Where it is possible among reasonable men to conjecture and find from the evidence a different result as to deliberation or premeditation, then it is for the jury to determine the degree of the crime, and the court errs in submitting such a case in the one degree only.

As we said in State v. Reed et al., supra: "* * * Where the law descends to particulars and prescribes that a murder perpetrated by means of torture is murder in the first degree, and the jury finds that the homicide was thus effected, how can it be said that murder in the second degree is included? If we may judge the legislative intent with respect to these special forms of murder by the distinction made plain as to ordinary murder, we may well say that the use of torture is made conclusive of that deliberation which characterizes murder in the first degree. The employment of that means of effecting the homicide deprives the jury of its prerogative of determining whether the murder is of the one degree or of the other. In such a case there can be

no compromise. The accused must be guilty in the first degree or not guilty at all."

In the case now under consideration, though the state recognizes the rule in this jurisdiction that the court must instruct in second degree, if there is any evidence thereof, it strongly contends that the evidence conclusively proves murder in the first degree, and nothing else.

To sustain this theory, we must say that the trial court, as a matter of law, could conclude from the facts, that the homicide was murder in the first degree. With this view we cannot agree.

In a very recent case, we said: "True it is that malice may be implied from an absence of considerable provocation, and that the intent to kill need have been entertained for but a moment. But those are principles of the law of murder in the second degree. They come down to us from the common law, when murder was simply the unlawful killing of a human being with malice aforethought. When the Legislature divided the crime of murder into degrees and segregated from the others those forms of murder deemed most atrocious, reserving for them the highest penalty within society's power to exact, something more was required to convict of the higher degree. Premeditation and implied malice do not suffice. Deliberation and express malice are necessary. When a case occurs in which the specific intent to kill is to be inferred only from the lack of considerable provocation and the purpose to slay is not shown to have been calmly and deliberately arrived at, it is a case of murder in the second degree." Torres v. State, 39 N. M. 191, 43 P.(2d) 929, 932.

In the instant case, from the facts, the jury could have drawn the conclusion that the murder of deceased was a cold, calm, planned, deliberate murder; a murder which appellant had cooly and calmly thought out with a calm and reflective mind in advance of the homicide. Nevertheless, the jury, if properly instructed, may have concluded that there was no proof of express malice. The jury may have concluded that the homicide was not deliberate. Such an hypothesis is not unreasonable. The jury is the judge of the facts, and malice and deliberation are questions of fact for the jury.

When the court instructed the jury on first-degree murder, and that degree only, it invaded the province of the jury and concluded from the facts, as a matter of law, that the appellant had deliberately planned the murder of Gussie Thomas.

We do not desire to leave the impression that the facts in this case, if believed by the jury, would not support a verdict of murder in the first degree. Had the jury been instructed on both first and second degree murder, and returned a verdict as here, such verdict might be sustained.

Nevertheless, the appellant was entitled to an instruction on murder in the second

degree; that chance for his life which was denied him.

In the recent case of Torres v. State, supra, we said:

"* * * we speak somewhat inaccurately when we inquire whether facts which would support a conviction of murder in the first degree may or must support a conviction of murder in the second degree. The question generally is rather whether facts showing the crime of murder are sufficient to raise it to the higher degree.

"The question then is whether the facts in this case warranted the trial judge in holding, as matter of law, that the plaintiff in error slew the deceased after thinking the matter over with calm and reflective mind, or after settled deliberation and in coolness of mind."

In this case, though the facts may be sufficient to have raised the crime to the higher degree, yet that was for the jury to determine, and the court was not warranted in withholding from the jury an instruction in the lesser degree, and thereby concluding for the jury, as a matter of law, that Bentford took the life of Gussie Thomas with a calm and reflective mind, or after settled deliberation and in coolness of mind.

The state's contention that this case parallels the case of State v. Johnson, 37 N. M. 280, 21 P.(2d) 813, is without merit. Without conceding the cases to be parallel, it is enough to say that the error complained of here was not raised in the Johnson Case.

The judgment will be reversed; the cause will be remanded for a new trial.

SADLER, C. J., and WATSON, J., concur.

BICKLEY, J., concurs specially.

HUDSPETH, J., dissents.

BICKLEY, Justice (concurring specially).

Since a majority hold that a decision in this case is not controlled by the decision in State v. Reed, cited, and that the case at bar is within the class of ordinary homicide cases, referred to in the Reed Case, I concur in the result.

HUDSPETH, Justice (dissenting).

The decision turns upon a question of evidence, or the want of it, and a further statement of facts seems essential to a proper understanding of the issue. Defendant's brief states:

"The scene of the alleged crime is at Central, a small town situate about ten miles from Silver City; New Mexico, in Grant County, and about two miles from Fort Bayard, where the large U. S. Veterans' Hospital is located. There are a good many colored people living at Central. The principal place for these people to visit and congregate is at the George Washington

place, which consists of a rather large adobe residence, an outside room for renting, other small outside buildings and a pool hall. At the time of the disappearance of Gussie Thomas, also known as 'Shorty' Thomas, colored, the deceased, she and a colored man by the name of Jim Noble were living together and had been living together for more than one year, although not married, in a small adobe house, across the paved Silver City-Bayard highway, only a short distance from the rear portion of the Washington place. Appellant, Alford Bentford, also known as 'Bert' Bentford, colored, the man Noble, and others worked for George Washington, colored, in his wood yard and in hauling in wood from the mountains. The deceased visited right along in the Washington home, and Bentford lived there, and all of them were on good terms and friends.

"On Saturday evening, December 16, 1933, T. H. Schroeter, accompanied by Ed. Wombley, came to Central looking for some one to go to the Schroeter home at Bayard, some two and one-half miles east of Central, to nurse his father who was ill, and Wombley had told Schroeter that Jim Noble had nursing experience at Fort Bayard and suggested they try to find Noble. Naturally, the first place they inquired was at the Washington place and about this time Bentford came from across the street toward the Washington place and was hailed by Schroeter and asked if he (Bentford) knew where Jim Noble lived and upon receiving an affirmative reply, Bentford got into the Schroeter car and was taken to the front of the two-room adobe house where Noble and the deceased lived. It appears from all the evidence that Bentford did not enter the Noble house, but called up Noble, and accompanied Noble to the Schroeter car, where both got into the rear seat of the car with Schroeter and there the conversation about the employment of Noble occurred. Noble accepted the employment; Schroeter took Wombley over to the main part of the town, had a glass of beer, came back in a short time, and Noble came out of the house and accompanied Schroeter to Bayard."

Noble testified that before his departure the defendant entered the room where the deceased was in bed and remained there a few moments, while he, Noble, was gathering up his clothes and preparing to depart for the scene of his labors. His patient died Monday morning, he returned to his home, and immediately started searching for the deceased. When the body was taken from the well a week later, the deceased's hands were tied behind her back, and the physician who examined the body testified:

"Q. Were there any wrappings or bandages around her face? A. Yes sir, two.

"Q. Where and what were they? A. The pajama pants were tied tightly around her neck and over her chin and mouth and another piece of cloth around her eyes.

"Q. Was there any other wrappings on her beside that? A. She had a pajama coat on and a brassiere.

"Q. Was there anything from the waist down? A. Nothing from the waist down.

"Q. The body from the waist down was nude? A. Well, she had on this menstrual belt and a pad. * * *"

Human blood was found on the bedclothing of the deceased, and other evidence was produced from her room.

It will be noted that this case is quite similar to that of State v. Johnson, 37 N. M. 280, 21 P.(2d) 813. It was submitted to the jury on like instructions, in which the court quoted our first-degree murder statute, as follows: "All murder which shall be perpetrated by means of poison or lying in wait, torture, or by any kind of wilful, deliberate and premeditated killing, or which is committed in the perpetration of or attempt to perpetrate any felony, or perpetrated from a deliberate and premeditated design unlawfully and maliciously to effect the death of any human being, or perpetrated by any act greatly dangerous to the lives of others, and indicating a depraved mind regardless of human life. * * *" (Comp. St., 1929, § 35-304).

No request was made for instruction on a lesser degree of homicide. In the Johnson Case, the defense was an alibi. In the case at bar, the defendant offered no evidence, but in the conversations with reference to his dreams, about which the state's witnesses testified, he claimed not to have been at the scene of the crime. 30 C. J. 404, § 650 states: "Where instruction not required. An instruction on murder in the second degree is not required where there is no evidence which tends to show that degree, as where the evidence, although circumstantial, shows that defendant is either guilty of murder in the first degree or innocent. Where the defense is an alibi, instructions on murder in the second degree may be properly omitted."

In the case of State v. Reed, 39 N. M. 44, 39 P.(2d )1005, the court cited with approval Sparf v. United States, 156 U. S. 51, 715, 15 S. Ct. 273, 292, 39 L. Ed. 343, 360, in which the opinion of the court by Mr. Justice Harlan states:

"Briefly stated, the contention of the accused is that although there may not have been any evidence whatever to support a verdict of guilty of an offense less than the one charged,—and such was the case here, —yet, to charge the jury, as matter of law, that the evidence in the case did not authorize any verdict except one of guilty or one of not guilty of the particular offense charged, was an interference with their legitimate functions, and therefore with the constitutional right of the accused to be tried by a jury.

"The error in the argument on behalf of the accused is in making the general rule as to the respective functions of court and

jury applicable equally to a case in which there is some substantial evidence to support the particular right asserted and a case in which there is an *entire absence of evidence* to establish such right. In the former class of cases the court may not, without impairing the constitutional right of trial by jury, do what, in the latter cases, it may often do without at all intrenching upon the constitutional functions of the jury. The law makes it the duty of the jury to return a verdict according to the evidence in the particular case before them. But, if there are no facts in evidence bearing upon the issue to be determined, it is the duty of the court, especially when so requested, to instruct them as to the law arising out of that state of case. So, if there be some evidence bearing upon a particular issue in a cause, but it is so meager as not, in law, to justify a verdict in favor of the party producing it, the court is in the line of duty when it so declares to the jury." (Citing cases.)

Defendant quotes from Territory v. Padilla, 8 N. M. 510, 46 P. 346, 347, from which quotation I take the following excerpt: "* * * If the rule were that every secret homicide presumes murder in the first degree, then the slayer of a man whose body is found pierced by bullets, having in its hand a weapon recently discharged, is placed in the same category as he who has slain unseen a defenseless woman, whose polluted corpse bears evidence of the utmost atrocity. * * *"

I agree with the learned counsel of defendant that there is no presumption of murder in the first degree, but there is substantial evidence in this record to support the verdict.

The case made by the record is first-degree murder. It is certainly "one of the forms of murder deemed most atrocious." The manner of taking life, and all the circumstances, furnish sufficient evidence of deliberation and express malice. The only other theory advanced, except general speculation, is that found in the case of State v. Kauffman, 329 Mo. 813, 46 S.W.(2d) 843, 847, where the court said: "There was no instruction submitting the case on the theory of a homicide committed in the perpetration of or attempt to perpetrate rape, the theory on which the state's case really proceeded, unless instruction No. 3 was meant to submit that issue. The evidence justified and called for 'an appropriate instruction submitting that issue. While defendant in his confession and oral statements nowhere used the word 'rape' or 'ravish,' he did say he 'attacked' deceased and in her struggle in resisting him she was killed. The word 'attack' does not necessarily mean ravish, but, used as it was in connection with the circumstances shown, it could reasonably have been understood and doubtless was intended to be understood as meaning that

he ravished or attempted to ravish her. However, if the court intended to submit the case only upon the hypothesis of a murder committed premeditatedly and with deliberation, disregarding the hypothesis of homicide committed in the perpetration of or attempt to perpetrate rape, then we think the instructions, in order fully to present the law, should have included an instruction on murder in the second degree. While we think there were sufficient circumstances shown, including defendant's statements and confession, to authorize a finding, if believed by the jury, of premeditated and deliberate murder, the defendant said in those statements and confession that the killing was not premeditated, that he had not intended to kill deceased."

If the defendant in this case had supplied such evidence, we would have had a different record, and, no doubt, the learned trial judge would have submitted it to the jury only as murder while perpetrating a felony. For this court to substitute conjecture for evidence, similar to that given in the Missouri case, to the effect that the killing was not premeditated, and that the defendant had not intended to kill, and to hold that since the trial court did not submit the case upon the theory of murder while perpetrating a felony, it was prejudicial error not to submit instructions on murder in the second degree, seems to me fallacious. Contrary to the rule in Missouri, in this state if the court had submitted instructions on first-degree murder on the hypothesis of homicide committed while in the perpetration of a felony, and submitted with it instruction on the second degree, a verdict of guilty of murder in the second degree would have resulted in the discharge of the defendant. See State v. Reed et al., supra.

In the case of Sparf v. United States, supra, there is an able dissenting opinion by Mr. Justice Gray, concurred in by Mr. Justice Shiras, which concludes: "For the twofold reason that the defendants, by the instructions given by the court to the jury, have been deprived both of their right to have the jury decide the law involved in the general issue, and also of their right to have the jury decide every matter of fact involved in that issue, we are of opinion that the judgment should be reversed, and the case remanded, with directions to order a new trial as to both defendants."

This doctrine has been followed in some of the states where all the degrees of homicide are submitted to the jury. We seem to be in neither camp, but wandering somewhere between the two positions. Under the minority rule, no doubt the jury would sometimes err on the side of mercy, but the case at bar falls so clearly in the class of first-degree murder that if all the degrees of homicide had been submitted to the jury, the identity of the perpetrator of the crime would have been the only question considered.

I dissent.