204 P.2d 443

**STATE v. KAPPEL.**

No. 5148.

Supreme Court of New Mexico.

March 24, 1949.

Robert M. Rowley, of Tucumcari, for appellant.

C. C. McCulloh, Atty. Gen. and Robert V. Wollard, Asst. Atty. Gen., for appellee.

SADLER, Justice.

The defendant was convicted of murder in the first degree and sentenced to death by electrocution. He prosecutes this appeal and asks that the judgment so rendered against him be reversed and a new trial awarded on the single ground that the trial court erred in refusing to submit murder in the second degree as a permissible verdict under the evidence. Hence, the review will be confined to resolving this one question.

The victim of the homicide was Bertha Kappel, wife of the defendant. About 5:30 a. m. on December 18, 1947, she was found dead on a street in the city of Tucumcari, three blocks from the house in which she, a young daughter, and her husband resided in the home of her brother, Roy Wagnon. There was a considerable amount of blood around the body and three extensive wounds on the head, inflicted by heavy blows from some blunt instrument. Shortly thereafter the defendant was placed under arrest charged with the murder of his wife.

At the time of her death the deceased was on the way to work in Home Cafe in the city of Tucumcari where she had been employed for a little more than two months. She, her husband, and her young daughter by a former marriage, all had been residing temporarily in the home of her brother, Roy Wagnon, his wife and baby. Somewhat recently she and her husband had purchased a lot not far removed from her. brother's home and some lumber from which the construction of a small building called a "shack" had been commenced with the idea of ultimately converting it into a residence for the family.

After arriving home from work about 4 o'clock the evening before her death, the deceased with her young daughter visited the lot mentioned and then returned home. In the meantime, and during deceased's absence, the defendant had arrived home and, learning that deceased had gone to visit the lot, departed in that direction. A little while after her return and about dark the defendant also returned. They began quarreling when the deceased accused him of having sold the lumber. Although defendant denied doing so, his denial was repudiated by the testimony of a neighbor to whom he had sold it. The deceased stated to defendant .the lumber had not been paid for and threatened that, unless he put the lumber back within three days, "she would turn him in." The quarrel continued into the supper hour around 7 o'clock and was finally ended by Roy Wagnon telling them he was tired of their "fussing" and admonishing them to be quiet.

When the evening meal had been finished and she had washed and dried the dishes, Mrs. Roy Wagnon went to a next door neighbor's to visit and remained there until 10:30 p. m., when she returned home. At that time she found all of them, her husband, his brother, Harry, who resided in the home with them, the defendant, his wife, the deceased and her little daughter, engaged in friendly conversation, "just laughing and talking."

The deceased arose at the early hour of five o'clock on the next morning, December 18, and started to work. The defendant arose shortly after she did. What transpired can best be stated in the words of the defendant who testified in his own behalf. He testified as follows:

"Q Did you and your wife at any time after going to bed, have any conversation or any fuss? A No.

"Q What was the feeling you had at that time after going to bed; had the argument ceased or was it still in progress? A It had ceased and we had made up.

"Q Who got up first the next morning? A She did.

"Q. Do you know what time it was? A About a quarter until 5 :00.

"Q How long was she up before you got up? A About 15 or 20 minutes.

"Q Was she dressed? A Yes.

"Q Was she fully dressed when you got up? A Yes.

"Q Did you have any conversation with her at that time? A No, only she told me to hurry up and come on.

"Q What did you do then? A I told her to wait a while, that I would be ready in a little bit.

"Q Did she answer that? A No.

"Q How long after that did she stay in the room? A About 5 minutes.

"Q What was she doing during that time? A Just standing there.

"Q Was she waiting for you? A I think so.

"Q What were you doing? A Putting on my clothes.

"Q Was anything further said at that time? A No.

"Q What happened next? A The next thing, she went out the door. I picked up my coat and started after her. I told her, 'Wait a minute until I get my coat on and I will go with you.' She said, 'You dirty son-of-a-bitch, if you are going with me, come on.'

"Q Where were you? A Standing in the kitchen door.

"Q Had she, at that time, gone out of the house? A Yes.

"Q What happened after that? A The nearest I remember happening after that, I slipped on my coat and I think I picked up the ax and followed her.

"Q Do you know you picked up the ax and followed her? A Not for sure. The next thing I remember, I was standing over her and I struck a match and seen what I had done.

"Q Do you remember following her up the street and striking her with the ax? A Not exactly, but I figure it is the only way it could have happened.

"Q Do you know you did do that? A I think I did.

"Q What did you do then? A I seen what had happened. I throwed the ax on a little shed and went back to the house and waited.

"Q Going back to the time when she had gone out the door and you stepped to the door and called for her to wait for you, how did you feel at that time? A Well, a throbbing headache had struck me.

"Q Did you feel ill? A Yes.

"Q Were you mad? A I don't know if I was or not.

"Q What did you do after you had struck her with the ax and saw her lying on the ground? A I got down beside her

and struck a match and seen what had happened. I just went back toward the house.

"Q What did you do then? A The first thing I done was to vomit and I got two aspirins and laid down.

"Q How did you feel then? A I just passed out, you might say.

"Q Adolph, did you have any reason to kill your wife? A No.

"Q Do you know why you did it? A No.

"Q Do you know you did do it? A Well, not for sure until after it was all over I realized what it was.

"Q When did you first decide you were going to kill your wife, Adolph? A I don't know.

"Q Did you decide you were going to kill her? A No.

*    *    *    *    *    *

"Q Did you sign this confession that has been presented here? A Yes, I think I did.

"Q You did that. When you signed it, did you know you had killed your wife? A Well, I figured I was about the only one that could have done it after I wound up with the ax.

"Q In other words, from the occurrence and from what you have learned, you know you are the one who killed your wife? A Yes.

"Q I will ask you again, did you have any reason to kill your wife? A No.

"Q At what time did you determine you were going to kill her? A No, sir.

"Q Did you determine you were going to kill her? A No, sir.

*    *    *    *    *    *

"Q After she left the house and you started to follow her, before you killed her, she said words to you something like, 'You slow son-of-a-bitch' or something like that, and then you grabbed the ax and followed her? A Yes.

"Q Until you overtook her and killed her? A Yes."

The defendant then returned to the house where they were residing, went to bed and remained there for an hour or an hour and a half, arose and ate a hearty breakfast and then, after visiting the cafe where his wife worked and informing those in charge she would not come to work that day, returned to a point near his wife's body, where he was taken into custody. Later he signed a confession in which he admitted killing his wife, assigning no motive or reason, although while being interrogated by sheriff B. T. Jennings following the homicide, he claimed to have killed her because he was mad following a quarrel over some lumber. The defendant admitted on cross-examination that he didn't like to be called "a son-of-a-bitch" and

that it made him "mad" when so called. The sheriff testified:

"Q What did he say with reference to what had occurred? A Well, I showed him the ax. At that time we had found it.

"Q You had the ax in the Sheriff's office? A Yes. I pointed to it and told him it looked bad for him. I asked him why he did it. He said it was over a quarrel. He said they had quarrelled that night until 11:00 or 12:00 o'clock over a bunch of lumber that had been sold.

"Q Did he say how he approached her that morning? A Yes, sir.

"Q Did he tell you how she left the house? A If I remember, he said she left the house around 5:00 o'clock or a little after.

"Q Did he get up when she left? A He did, but he was a little slow about getting ready to go. She had got very near to the alley, or to the street from the alley when he came out the door and picked up the ax. That was this ax here. He followed her and over took her three blocks south and walked up behind her and struck her. She fell and he said he hit her either two or three more licks while she was down. He struck a match and looked at her and he said he saw 'that was all she wrote'.

\*   \*   \*   \*   \*   \*

"Q In your conversation with the defendant, did you ever ask the defendant whether or not he realized what he was doing? A Yes

"Q Whether he realized if he was doing something right or wrong? A I did at one time, yes.

"Q What was his reply to that? A He said he killed her because he was mad.

"Q When was that? A It was the morning I arrested him. I judge it was around 10:00 or 11:00."

When the testimony was all in and both sides had rested, the defendant's attorney requested the court to submit for consideration of the jury a form of verdict finding defendant guilty of murder in the second degree, while submitting one calling for a verdict of murder in the first degree. This request was denied. We are compelled under previous decisions of this court to announce the denial of the request made constitutes reversible error. State v. Smith, 26 N.M. 482, 194 P. 869; State v. Reed, 39 N.M. 44, 39 P.2d 1005, 102 A.L.R. 995; Torres v. State, 39 N.M. 191, 43 P.2d 929; State v. Wickman, 39 N.M. 198, 43 P.2d 933; State v. Bentford, 39 N.M. 293, 46 P.2d 658; State v. Young, 51 N.M. 77, 178 P.2d 592.

The distinction between murder in the first and second degree has been so often and so exhaustively pointed out in the opinions in the cases cited, as well as in others, that it would be a work of supereroga-

tion to quote extensively from them or restate except very briefly what they affirm. Suffice it to say that unless we have a case where the very means employed in committing a homicide, as by torture, poison, or lying in wait (1941 Comp., § 41-2404) supply proof of the deliberation, the intensified malice, necessary to raise the grade of the offense to first degree as a matter of law; or unless it be one committed in the perpetration of, or attempt to perpetrate, a felony (Id., § 41-2404) where by legislative fiat the circumstances under which the killing occurred render conclusive the presence of such deliberation, it is always necessary to submit second degree and thus permit the jury to say whether it is the one or the other—first or second degree. Torres v. State, supra; State v. Wickman, supra; State v. Bentford, supra.

In State v. Wickman, the defendant was convicted of slaying his wife and sentenced to death. He complained here of the court's failure to submit second degree to the jury. We held it reversible error to fail so to do and awarded a new trial. The cases are enough alike to render what was there said quite pertinent to solution of the question now presented. After referring to State v. Reed, supra, as a case of murder by torture and, hence, error to submit second degree and to State v. Welch, 37 N.M. 549, 25 P.2d 211, where second degree was absent, being a homicide charged to have been committed in the perpetration of a felony, both affording good examples of forms of murder readily identifiable, we said [39 N.M. 198, 43 P.2d 935]:

"Those cases do not answer the question whether in any other class of homicide the state of mind of the slayer, as to the quality or grade of his malice, may be so laid bare by evidence as to permit the judge to declare it as matter of law. That question did not arise in Torres v. State, supra. In that case we were compelled to hold that the circumstances were susceptible of more than one construction. In such a case the choice is admittedly for the jury.

\* \* \* \* \* \*

"We take it that if an accused slayer should testify in his own behalf that he committed the homicide upon a sudden impulse, without having planned or sought the encounter, and without having considered the consequences, it would raise a question of fact as to his state of mind, no matter how strongly other evidence might suggest that the killing had been deliberately planned for the basest purpose. How does the case at bar differ from such a case?

"The state introduced res gestae statements of appellant, in which he claimed that the deceased was killed by a passing automobile. It also introduced the confession, in which appellant admitted that he killed the deceased with a heavy iron. He did not confess that he killed her, not

suddenly, and after his mind had weighed all the matters presented to it. The one thing that stands out in this incoherent statement is in effect a denial of having weighed matters, a denial of the state's theory of law and fact. What appellant had been weighing was suicide. The impulse to slay came upon him suddenly with the opportunity, and he acted upon it.

"Lame as this claim of mitigation is likely to seem in the eyes of the jury, we do not see how the judge can take it from the jury's consideration. If it is true, the crime was murder in the second degree. The jury could accept such part of this confession as it believed, and reject the rest. The judge could reject none of it."

Again, in State v. Bentford, supra, where the state's theory of first degree had abundant support in the shocking details of a brutal slaying, as is the case here; nevertheless, we held it error for the trial court to rule as a matter of law that there was present the deliberation, so essential to raising the homicide from the grade of second degree to the rank of atrocious murders, deserving of the severest penalty known to the law. Torres v. State. We said [39 N.M. 293, 46 P.2d 661]:

"When the court instructed the jury on first-degree murder, and that degree only, it invaded the province of the jury and concluded from the facts, as a matter of law, that the appellant had deliberately planned the murder of Gussie Thomas.

\*　　\*　　\*　　\*　　\*　　\*

"In this case, though the facts may be sufficient to have raised the crime to the higher degree, yet that was for the jury to determine and the court was not warranted in withholding from the jury an instruction in the lesser degree, and thereby concluding for the jury, as a matter of law, that Bentford took the life of Gussie Thomas with a calm and reflective mind, or after settled deliberation and in coolness of mind."

Here, as said in the Wickman case, lame as defendant's claim may seem to the jury that he had not planned or thought out beforehand the slaying of his wife, in view of the stark details of the killing he, himself, related; nevertheless, there, in his own words stands his denial although there is little, if anything, elsewhere in the evidence to lend it support. It was the jury's province, not the court's, to believe or disbelieve his story. The trial court should have submitted both first and second degree murder. There is no evidence that would have warranted the submission of manslaughter.

While no error is assigned to the instructions, in view of the conclusions reached, it will be necessary for the trial court upon a new trial to recast paragraphs Nos. 7

and 8 of the instructions given so as properly to define and differentiate between murder in the first and murder in the second degree.

The trial court having erred in refusing to submit second degree as a permissible verdict, the judgment must be reversed and the cause remanded with a direction to set it aside and award defendant a new trial.

It is so ordered.

BRICE, C. J., and LUJAN, McGHEE, and COMPTON, JJ., concur.