# STATE v. TRUJILLO.

No. 7269.   Decided January 25, 1950.   (214 P. 2d 626.)

238

See 40 C. J. S., Homicide, sec. 33. Interpreter in criminal action as within court's discretion, see note, 140 A. L. R. 766. See, also, 52 Am. Jur. 44.

*Keith Browne,* Salt Lake City, for appellant.

*Duane A. Frandsen,* Dist. Atty., Price, *Clinton D. Vernon,* Atty. Gen., *Allen B. Sorenson,* Asst. Atty. Gen., for respondent.

PRATT, Chief Justice.

Defendant Joe Trujillo was charged with and found guilty of the first degree murder of one Max Lopez. He has appealed.

The first assignments of error confront us with a jurisdictional question founded upon Sec. 105-17-1, U. C. A. 1943, which we quote: (Referring to an information)

"Filing After Examination and Commitment.

"When a defendant has been examined and *committed as provided in this code* it shall be the duty of the district attorney, within thirty days thereafter, to file in the district court of the county in which the offense is triable an information charging the defendant with the offense for which he is held to answer. If the district attorney fails to file the information within the time specified, or when required so to do by the court, he shall be deemed guilty of contempt, and may be prosecuted for neglect of duty as in other cases." (Italics added.) (In the present case a city judge was the committing magistrate, see Sec. 105-10-5, U. S. C. A. 1943.)

On July 2, 1948, the district attorney filed, in the district court, the information charging the defendant as indicated above. The transcript of the proceedings of the preliminary hearing in the city court was not filed in the district court until July 6, 1948. The defense maintains that the filing of the information before the transcript was filed was error, and argues two reasons which are set out as follows: (They are in the words of appellant's brief.)

(1) The district court does not have jurisdiction in a felony case until the proceedings from the committing magistrate are filed in the district court.

(2) The district attorney does not have authority to file an information until the proceedings from the committing magistrate are filed in the district court.

These issues were raised in the lower court by motion to quash the information, and conform to the grounds authorized by Sec. 105-23-3, U. C. A. 1943, covering motions to quash.

When does the district attorney's duty to file an information first arise? Within 30 days of that time he must act.

The information recited the commitment as follows:

*"Information*

"Joe G. Trujillo, also known as Joe Garcia Trujillo, *having been on the 1st day of July, 1948,* by S. J. Sweetring, Judge of the Price City Court in and for Carbon County, State of Utah, *duly committed to answer to the crime of murder in the 1st degree,* is accused by Duane A. Frandsen, District Attorney of the Seventh Judicial District of said crime committed as follows: That said defendant on or about the 26th day of May, 1948, at and within Carbon County, State of Utah, murdered Max Lopez * * *" (Italics added.)

Speaking of the July 1st proceedings before him the committing magistrate's transcript of the proceedings has this to say:

"The court found that the offense of murder in the first degree had been committed; and that there was sufficient cause to believe the defendant Joe G. Trujillo, also known as Joe Garcia Trujillo, guilty thereof; and it was ordered by the court that said defendant be held to answer to said charge; and that he be committed to the Sheriff of Carbon County without bail."

This transcript was dated July 6, 1948, and was filed in the district court on that date. Included with the transcript was the complaint indorsed July 1st, 1948, as required by Secs. 105-15-19 and 20, U. C. A. 1943; and a copy of the

commitment dated July 1st, 1948, in the form required by Sec. 105-15-23, U. C. A. 1943. This latter section we quote along with the affidavit of the committing magistrate as to his compliance with its requirements.

"105-15-23. Committment How Made and to Whom Delivered.

"If the magistrate orders the defendant to be committed, he must make out a commitment, signed by himself and his official title, and deliver it with the defendant to the officer to whom he is committed, or, if that officer is not present, to a peace officer, who must immediately deliver the defendant into the proper custody, together with the commitment."

### The Affidavit of Committing Magistrate

"* * * That at the conclusion of the preliminary hearing as aforesaid affiant herein made an Order holding the defendant for trial in the District Court on the offense set forth in the Complaint on file in the City Court of Price City. That an Order of Commitment was not prepared at the time the defendant left the Court Room after the Order was made holding him for trial nor was any commitment made and signed by me until later in the day. A commitment was not signed by me in the presence of the defendant and the officer having him in charge nor was a commitment delivered with the defendant to the officer having him in charge at the time of the departure of said officer with the defendant from the courtroom after the order was made and endorsed on the complaint holding the defendant for trial.

"I do not recall whether or not I personally delivered the commitment to the Sheriff of Carbon County or whether the Clerk of the Court delivered the commitment to the Sheriff at my direction but I am positive that it was not delivered by me to anyone in the Court Room in the presence of the defendant. * * *"

(It might be well to mention here a fact we all know that as the City Court has a clerk's office many actions of the judge would be through that office, whereas a Justice of the Peace, without such facilities would act in person.)

There are two more sections of our code bearing directly upon this procedure that we wish to quote before discussing the merits of those two assignments of error:

"105-15-32. Magistrate to Make Full Returns of Proceedings to District Court—Penalty for Failure.

"When the magistrate has discharged the defendant or has held him to answer, he must, within five days, return to the clerk of the district court the warrant, if any; the complaint and the depositions, if any; a list of the names and the post-office addresses of all witnesses for the state, if he can ascertain them; and all undertakings of bail and for the appearance of witnesses taken by him, together with a certified copy of the record of the proceedings as it appears on his docket. Failure of the magistrate to make such return within the time herein stated shall be deemed a contempt of the court before which the defendant is required to appear, for which the magistrate shall be fined by said court not less than $10 and not more than $100."

Section 19-15-3, U. C. A. 1943, covering duties of the county attorney, has this to say:

"To Transmit Record in Felony Cases.

"*Immediately* upon the termination of any examination before any justice of the peace of any person charged with felony, where such person has been ordered held to answer in the district court, the county attorney shall forward to the district attorney a transcript of the docket of such case, including a copy of the original complaint *and of the commitment,* a list of the necessary witnesses for the state with their post-office addresses, and such a statement of the facts as will enable the district attorney to determine for what specific offense an information should be filed in the district court." (Italics added.)

All public offenses such as this felony are to be tried upon information after examination and commitment. Art. 1, Sec. 13, Utah Const. Secs. 105-1-4 and 105-16-1, U. C. A. 1943. See also *State* v. *Johnson,* 100 Utah 316, 114 P. 2d 1034, and Sec. 105-21-5, U. C. A. 1943.

In the case of *State* v. *Freeman,* 93 Utah 125, 71 P. 2d 196, 199, in discussing the question of jurisdiction in the district court due to a claim that defendant had not had a preliminary hearing, this Supreme Court said:

"(1) The right of the district court to try any one for a felony rests upon the filing in such court of a proper indictment by grand

jury, or the filing of a proper information by the district attorney, or other proper counsel for the state. R. S. Utah 1933, 105-17-1. And such information can be filed properly, only after the accused has been duly bound over and held to answer in the district court by a magistrate having jurisdiction to investigate the charge and determine if there is probable cause to believe an offense has been committed and that defendant is guilty thereof."

\* \* \* \* \*

"That court, as indicated above, acquires its right to proceed from *the 'binding over' of the defendant, his being held to answer, by a magistrate.* True, the magistrate is required to indorse on the complaint, if he holds the defendant to answer, an order to the following effect:

" 'It appearing to me that the offense in the within complaint mentioned (or any offense according to the fact, stating generally the nature thereof) has been committed, and there is sufficient cause to believe the within named A. B. guilty thereof, I order that he be held to answer to the same.' R. S. Utah 1933, 105-15-19.

"It is then provided that the magistrate must transmit to the district court the warrant, the complaint, the depositions, if any, 'together with a certified copy of the record of the proceedings as it appears on his docket.' R. S. Utah 1933, 105-15-32." (Italics added.)

To bring the case to the knowledge of the district attorney as a basis for his preparation and filing of the information, Section 19-15-3 above makes it unnecessary that the transcript of the proceedings before the committing magistrate be on file in the district court. The district attorney gets that information from the county attorney. He may rely upon the county attorney's information. It is not likely that Sec. 105-17-1 (above) which requires him to act within a thirty day period, would start that period to running at a time when his action would be useless from the standpoint of initiating district court action. The defense seems to think that his duty to act does not arise until the "return" of the committing magistrate, as required by Sec. 105-15-32 (above) has been filed in the district court. But a "return" of proceedings is usually merely an evidentiary matter—a written statement by the officer of his official acts pursuant to particular authority.

42 Am. Jur. 104, Sec. 117. His official acts are the important matters in the question of jurisdiction. The return in this case recites that the accused *was held* to answer on July 1st. A commitment is shown to have been issued and to have been delivered to the officer on that date. What more should be required so far as commiting the accused is concerned? Is not the accused committed when the committing magistrate orders him held pending further proceedings against him? When the county attorney is called upon to inform the district attorney of the commitment of the accused, Sec. 19-15-3 above, he is directed to forward a copy of the commitment along with other papers. Presumably this is to indicate to the district attorney that defendant has been committed. It seems reasonable to say that the delivery of the commitment to the officer pursuant to Sec. 105-15-23, above, is the final act that accomplishes the accused's commitment, and that the time for the district attorney to file the information starts running from that date. The district attorney learns of that date "immediately," Sec. 19-15-3, from the county attorney. The requirement that the magistrate make a return of his proceedings to the district court, Sec. 105-15-32 above, is for the purpose of promptly getting before that court for evidentiary purposes, a record of the steps leading up to the filing of the information. The accused is brought under the power of the district court by the filing of the information; and the record from the committing magistrate is to evidence the regularity or irregularity of the proceedings leading up thereto. In other words, the filing of the transcript is not a part of the process of committing the accused; but is merely a method of recording the facts of his commitment that they may be examined for future use. The order on back of the complaint binds him over and the commitment holds him to answer. Secs. 105-15-19, 20, and 23, U. C. A. 1943. After these sections have been complied with, by the committing magistrate, the accused is *"committed as provided in this code."* He is committed to await proceedings in the district court.

The defense assignments of error raising these issues are not well taken.

Now to the merits of the case.

The fatal shooting was the aftermath of an evening of drinking and visiting of various bars, in which four had at times participated.

One Mondragon and defendant Trujillo were drinking together, at various bars in Price. They encountered the deceased Lopez and one Herrera, who were also together drinking. The four joined forces and continued drinking at various bars. Trujillo indicated that he and the others had some whiskey which he had purchased during the day, and that the others also had some wine, which he, defendant, had purchased earlier in the day for Mondragon. There appears to have been some arguments between Herrera and Trujillo, and between Lopez and Trujillo during the evening. It was nothing serious apparently and the parties appeared to have parted at the beer halls friendly toward each other. Herrera indicated that he and Trujillo had had a disagreement at one of the bars which they visited, but that later they were on friendly terms, and that Trujillo and Lopez had settled their differences.

Trujillo, accompanied by Joe Mondragon, in Trujillo's automobile, a two-tone black and grey 1942 Buick, started out on highway U-10 in the direction of Hiawatha, Utah. Enroute they encountered Lopez and Herrera in the Lopez automobile. According to Trujillo's version the Lopez car was parked on the shoulder of the highway with its lights off and Herrera flagged him down. According to Herrera's version, Lopez drove his automobile only a short distance south out of Price and then requested that he, Herrera, drive. Thereafter Herrera proceeded to drive south toward Hiawatha, when the defendant Trujillo's car passed them and forced them off the highway.

The facts from the time of leaving the beer hall, are disputed, with at least two versions being presented, and fre-

quently three versions, one from each of the three participants.

As to the events leading up to the fatal shooting, after Trujillo stopped his car, three versions are presented. Herrera's version is that Trujillo after running them off the road, jumped out of his car and ran back toward the Lopez car and said: "Come this way, and I will take you both on." Then he, Herrera, got out of the car followed by Lopez, crossed the road, and thereafter he saw that Trujillo had a gun in his hand. That at this time Trujillo threatened to shoot them, and that he, Herrera, offered to fight if the gun was disposed of. Then he removed his shirt, and moving in closer, grabbed Trujillo's wrist. They wrestled and Trujillo hit him in the stomach doubling him over, and making him dizzy. While in this dizzy condition he heard a shot which from the direction of the flame appeared to be coming toward him. He then heard two more shots and saw the defendant go from the Lopez car to his own car, get in it and drive away. Herrera then went to the Lopez car and opened the door of the car and there saw Lopez, inside. Herrera admitted to having consumed several drinks of beer, but maintained that his dizziness on the road came from having been struck in the stomach by Trujillo, and not from his drinking. He indicated that he did not recall that Mondragon had ever come near him after the shots were fired.

Mondragon's account is that he was with Trujillo, when they passed the Lopez car while it was still moving, and Trujillo said he was going to stop and see the boys. He went passed them and stopped and got out. Mondragon got out when he heard a shot fired, and saw Trujillo and Herrera talking. Herrera asked the defendant if defendant was going to shoot him, and defendant replied, "No, but don't get near me." Herrera then grabbed Trujillo, and they began to wrestle. He heard another shot as they were wrestling and Herrera fell. Mondragon placed Lopez as being

beside him at the time the wrestling began. When Herrera fell, he Mondragon went to where Herrera lay and helped him to the rear of the Lopez car where he left him and then he proceeded to the defendant's car. He passed Trujillo who was standing in front and to the left of the Lopez car. After he passed the defendant, he heard another shot, which shot came from somewhere behind him, and he looked back and saw the defendant coming from the direction of the Lopez car. Neither Mondragon nor Herrera saw Lopez after the fight commenced. Trujillo in his account, however, indicates that Lopez was shot while on the highway, and that he saw Lopez where he fell.

The Trujillo account is to the effect that the Lopez car was stopped along the highway with the lights out, and he stopped, and went to that car to assist Herrera in fixing the lights. Herrera used vile language toward him, took off his shirt and commenced fighting with him. Both Lopez and Mondragon were out of the cars, and Mondragon instructed Lopez to stay out of the fight, as he was about to interfere when Trujillo had knocked Herrera down. During the course of the fight Mondragon fired five shots from the gun, which he had taken from the glove compartment of the defendant's car. When defendant heard the shots he let go of Herrera, and saw Lopez fall on the highway, and Mondragon called to him to leave. They then drove away, and agreed on a false story if Lopez was dead, because Mondragon had done the shooting and it was Trujillo's gun. Defendant further claims that Mondragon told him he had been required to shoot Lopez to keep Lopez from attacking Trujillo with a knife. Mondragon first entreated Trujillo to help him escape, but that he, Trujillo, refused, and then came the agreement to stick to the false story.

After the shooting and after the Trujillo car had driven away, Herrera's story is that he became frightened that Trujillo might return and shoot him, and he therefore ran out onto the fields adjoining the road. Thereafter he returned, and flagged a car down and reported the fatal shoot-

ing. Sometime thereafter the police arrived at the scene and Herrera returned to the road to them.

Mondragon and Trujillo agree that they drove toward Hiawatha, and then turned around and drove back past the scene of the shooting. They did this twice, the second time observing the police at the scene, and they then continued on toward Price. Enroute they were passed by the police car, and as they entered Price they were stopped at a police blockade and taken into custody. Both told a fabricated story of having been to Hiawatha to see Trujillo's daughter, and having returned when they saw no lights at the place where his daughter was staying, and that they knew nothing about the shooting. Later, at the inquest, Mondragon changed his story to substantially what is set forth above. After the inquest, Trujillo called the sheriff and other officials together, and accused Mondragon of the shooting, and confessed that the story previously told by both was false.

Trujillo lead the officers to the place where the gun had been thrown out of the car. Trujillo claiming that Mondragon had thrown it out as they approached Price. The gun was found on the west side of the highway. Trujillo explains this by saying that Mondragon got in the back seat as they passed the scene of the shooting going toward Price, to see if the officers were following them, and that he wound down the rear window and threw it out the left rear window. The evidence indicated that the Trujillo car was a late model Buick; one in which the rear windows would roll only partially down.

Five cartridges were found in a little pile at the side of the road about a mile and a quarter south of the scene of the shooting, at a point where tire tracks indicated that a car had turned around. The tire tracks were identified by a state highway patrolman as being the same as those of the Trujillo car.

The state introduced testimony of Lopez's widow which established that Trujillo had sold Lopez coal some four years earlier. Herrera also at one point in his testimony stated that Max (Lopez) told him they (Lopez and Trujillo) had had a quarrel in reference to coal, but that Max had said: "All right, we are all right now," and from this he had concluded that they had had some type of difficulty which had been agreeably settled. The substance of Herrera's testimony was that if Lopez and Trujillo had any disagreement, that it was settled.

The evidence of the wounds, the blood and the position of the Lopez body after the shooting is quite important in this case, especially in view of the conflicting stories by the participants.

An examination of the Lopez body revealed that two .32 caliber slugs had entered his body. One slug entered the body under the left arm pit, and traversed a straight line across the body, coming to rest finally just under the skin on the opposite or right side of the body a little back of the right arm, and under that arm. The other slug entered the body at about the left nipple and traversed a diagonal course, coming to rest close to the surface on the right side, and at a point slightly above the hip bone. The body when found by the police was in a semi-sitting position, slumped to the right in the Lopez car, a Studebaker coupe. The feet were in the general position of driving, and the body had slumped over on the seat, toward the right. There was evidence of profuse bleeding through the nose and mouth and little bleeding from the wounds proper. The car seat was splattered with blood; no blood was discovered on the outside of the vehicle or around it. In response to hypothetical questions, an expert medical witness testified that the bullet going straight across would cause death in a very few minutes, and loss of bodily control within a minute or two; and that the one traversing diagonally would probably

prove fatal in a very short time—within a minute, more or less, and almost instantaneous collapse.

The defense attacks the court's instructions No. 2 and No. 7, as failing to properly distinguish between first degree and second degree murder. Instruction No. 2 is a long instruction which defines murder in the first degree, murder in the second degree, voluntary manslaughter and involuntary manslaughter; and their various elements.

Before discussing its merits, let us consider briefly the principal elements of murder in its two degrees. "Malice aforethought" is a state of mind. The "aforethought" is the giving thought beforehand to malicious feelings or desires. It has no implications of adopting a plan of action to exercise those feelings or desires. "Malice" as applied to murder, Sec. 103-1-3, 103-28-2, is the wish to kill, or to do great bodily harm, or to do an act knowing that its reasonable and natural consequence would be death or great bodily harm. Thus, when murder is defined as the unlawful killing of a human being with malice aforethought, it is the unlawful killing of a human being after giving thought beforehand to the desire to kill, or to cause great bodily injury or to do an act knowing that its reasonable and natural consequence would be death or great bodily injury. This is the common law murder, or murder in the second degree under our code.

Murder in the first degree has added to the above state of mind the elements of deliberation and premeditation—elements that imply a cool weighing and consideration of a means of accomplishing the results of those malicious desires. It is evidenced by some of the specific methods indicated, such as poisoning or lying in wait. Sec. 103-28-3. (In this case we are not concerned with killings committed in the perpetration of the particular felonies specified in the section.) The fact that the person killed was not the intended victim does not make the offense any the less murder if the intent to kill any person was existent.

Instruction No. 2, in the present case, seeks to define in the abstract the elements of murder in the first degree and murder in the second degree. It fails to properly recognize that in both degrees the intent to kill, as distinguished from the intent to do great bodily harm, may be an important element in the meaning of "malice" depending, of course, upon the circumstances of the case. Furthermore, applying the instruction concretely to the case before it, the lower court left out that element in the consideration of murder in the second degree. This error is found in instruction No. 7. In that instruction the court limited the intent in second degree murder to that of doing great bodily harm. The effect of such a limitation is to impress the jury with the thought that if the intent to kill was present, then the offense must be murder in the first degree; whereas, if the intent is that of doing great bodily harm, it is murder in the second degree, depending of course, upon the other elements necessary. It takes no argument to convince one that such an error is prejudicial to the accused. In other words, if all the elements of murder in the second degree were shown, and one of those elements was the intent to kill, the jury must conclude from the court's instructions that, in view of that intent to kill, their verdict should be murder in the first degree, not second degree.

In view of the necessity of returning the case for a new trial on account of the specific prejudicial error just discussed, we shall give a general discussion of other alleged errors.

The offense of voluntary manslaughter is defined in the case of *State* v. *Cobo,* 90 Utah 89, 60 P. 2d 952, as including the intent to kill or the intent to do great bodily harm. (See headnote 2 thereof.) But it also says that the intent may be inferred from the use of a deadly weapon. In the instructions in this case, the lower court spoke of intentional shooting into the body of the

deceased, but made no statement of what intent as to injury to the victim or death to the victim might be inferred from such a shooting, or from the use of a deadly weapon. There is danger in such an instruction in that it tends to lead the jury to believe that an intention to kill, as distinguished from an intention to do great bodily harm, of necessity places the offense in the class of murder, rather than in the class of manslaughter.

The defense has taken exception to this italicized expression in the instructions:—(from instruction ■ No. 6)

*"If from any theory of the evidence in this case* your minds are satisfied beyond all reasonable doubt that the defendant fired one or more shots into the body of Max Lopez  *  *  *."

(This is followed by an application of the elements of murder in the first degree.)

It, no doubt, would have been better for the court to have said:

"If from any theory of the evidence viewed in the light of these instructions as to the law  *  *  *,"

but we cannot say that the error, if it was error, was prejudicial to the accused in view of the general stock instructions given by the court that all instructions must be considered together, and not as if one instruction were intended to present the whole law of the case.

The defense has taken exception to the use and the manner of the use of an interpreter. Without going into detail it is sufficient to say that it is within the sound discretion of the trial court as to whether or not an interpreter is necessary. A question and answer typed out in the ■ transcript may appear perfectly clear; but if one were present, as is the trial judge, and heard the witnesses' answers he might come to an entirely different conclusion as to the clarity of understanding of the Eng-

lish language possessed by the witness. Before the lower court is overruled in his use of an interpreter, there should be positive evidence of an abuse of discretion on his part. It is the function of an interpreter to transmit question and answer between counsel and the witness, that the court and jury may hear and understand what is said. Were all parties talking in English the witness' answer be it what it may, would go into the record. That situation should continue even though an interpreter is used. It is not his function to try to guide the witness in his answers along a line of testimony he believes is desired. The most he should do is to repeat the questions in the foreign language and to see that the witness understands them; and then repeat in English the answers to the questions, be they what they may. The greatest fault in interpretation lies in the interpreter concluding what is wanted. For example: The question is asked: "What were you doing that night?" Instead of repeating that question in the foreign language the interpreter says, in that language: "They want to know what you were doing the night of the first." Now the question may not have contemplated the night of the first at all, but the interpreter thought it did—and the result is foreign to the desires of the litigants. The court should see that question and answer are repeated as nearly as possible in translation.

The defense takes exception to the court's instruction on intoxication. The court instructed properly upon the effect of intoxication upon intent; but limited intent to the two offenses of murder in the first degree and murder in the second degree. It is material in voluntary manslaughter too. However, in this case, the error could hardly be considered prejudicial, as the defendant denied that he was intoxicated, and the jury evidently believed him.

The defense objects to the court's instruction upon the use of evidence of prior convictions. This in-

struction is short, and we quote it:

"Instruction No. 19

"Evidence has been elicited from the Defendant to the effect that he has prior hereto been convicted of a felony. You are instructed that such evidence should be considered by you only so far as it may affect the credibility of the Defendant as a witness in his own behalf."

It properly states the law, and we do not believe that there is any necessity of defining "credibility" as claimed by the defense should have been done. That is a word that has general use. The court must assume that the members of the jury are familiar with words of common use in the English language. The purpose of the instruction could have been clarified to some extent by including therein the caution that such evidence was not to be considered as evidence of guilt of the offense charged.

The verdict and judgment of the lower court are set aside and the case is remanded for new trial.

WADE, Justice (concurring).

I agree with the prevailing opinion on the jurisdictional question and also conclude that prejudicial error was committed in the instructions. I agree that second degree murder is possible even where the killing was intentional. Probably State v. Russell, 106 Utah 116, 145 P. 2d 1003, created the impression that where the killing was intentional there could be no second degree murder but that the case did not so hold nor did the trial court so instruct the jury in this case. The instructions here merely failed to point out the factual situation under which the defendant would be guilty of second degree murder with an intentional killing. I recall no other case where this possibility has been expressly pointed out either by an appellate court or by jury instructions, and I believe that this defect has existed in practically all murder case instructions in which I have participated.

In the *Russell* case the trial court instructed the jury that unless they found that the killing was intentional they should not find defendant guilty of second degree murder. There we pointed out that such intention was not a necessary element of second degree murder but was a necessary element of first degree murder. We also pointed out that according to some courts a more cool and collected mind is required by the term "deliberation" which is used in describing murder in the first degree, than is required by the term "malice aforethought" which is used in describing murder in the second degree; and in the later case of *State* v. *Thompson*, 110 Utah 113, 170 P. 2d 153, in commenting on this we definitely pointed out that first degree murder requires a more cool and calm consideration in arriving at the intention to kill than is necessary for murder in the second degree. This being true, it follows that with an intentional killing but without sufficiently cool deliberation to constitute murder in the first degree, where the other necessary elements are present, second degree murder would result.

Closely allied to the above omission the instructions failed, in applying the law to the facts in instruction No. 7, to point out two other factual situations which would require a second degree murder verdict: (1) The court failed to point out that more cool and calm deliberation, *State* v. *Thompson*, supra, and more clearness of mind, *State* v. *Stenback*, 78 Utah 350, 2 P. 2d 1050, 79 A. L. R. 878, are required in planning a first degree murder than is necessary for murder in the second degree although in defining terms in instruction No. 2, the jury was told that the term "deliberation" required a more cool mind in the planning than "malice aforethought." (2) The court failed to point out that if the defendant fired the fatal shot without intending to kill or do decedent great bodily harm but did intentionally shoot him knowing that such would be the natural and probable result thereof he would still be guilty

of second degree murder. But in instruction No. 2 it was pointed out that such an intention was sufficient to constitute second degree murder. In none of these omissions did the court in terms expressly misstate the law or misapply the law to the facts, it merely failed to point out all of the possible fact situations which would constitute second degree murder.

Where human life is at stake it is very important that the jury receive a correct impression of the necessary facts within the evidence which must be found in order to warrant a conviction of the various degrees of murder and manslaughter. It requires great skill and careful thought on the part of a trial judge to accurately explain to the jury the various distinctions. The important thing is to enlighten the jury on their problem. A learned treatise on the law for the appellate court is not necessary. The law should be applied to the facts disclosed by the evidence in clear and concise layman's language and ancient legalistic terms and involved definitions should be avoided where possible, even though the statute is couched in such terms. The jury will usually understand much more clearly an explanation in layman's terms than one in legal language accompanied by involved definitions. Only the law applicable to the facts as shown by the evidence should be mentioned and theories of guilt not supported by the evidence should not be submitted to the jury. The instructions as a whole as well as individual instructions should be made as brief as possible and still cover the required field, for the human mind is incapable of retaining even the salient features of instructions which are too long even though they are otherwise unobjectionable.

This case presents a common pattern of murder cases where the facts would sustain a finding of either first or second degree murder and, in my opinion, of voluntary and involuntary manslaughter. Under the evidence here if defendant is guilty of first degree murder it comes only

under categories (1) or (3) of the classifications thereof in the *Russell* case. It involves only the last part of category (1) which is the same as category (3) except in the latter the intention must be to kill someone other than the person killed. I doubt that the evidence here would sustain a conviction under category (3). The following discussion applies only to the law governing the facts of this cast under the last part of category (1). If this was first degree murder thereunder it must have been, to use the words of the statute, "willful, deliberate, malicious and premeditated killing." Section 103-28-3, U. C. A. 1943. That requires that the fatal shot was fired by defendant with the intention to kill the decedent pursuant to a previously formed plan or design arrived at after cool deliberation · and with a clear understanding of the nature of his acts and without adequate justification. Anything short of this was not murder in the first degree but might have been murder in the second degree.

To constitute second degree murder requires an "unlawful killing of a human being with malice aforethought," Sec. 103-28-1, U. C. A. 1943, and a homicide other than first degree murder "committed under such circumstances as would have constituted murder at common law," Sec. 103-28-3, U. C. A. 1943. The defendent could have had any one of three possible different intentions in firing the fatal shot in order to be guilty of second degree murder; (1) an intention to kill decedent thought out and planned beforehand but without the necessary cool and calculated deliberation or without a sufficiently clear understanding of the nature of his act necessary for first degree murder; (2) without an intention to kill but only intending to do decedent great bodily harm; and (3) without intending to kill decedent or do him great bodily harm but intending to shoot him knowing that the natural and probable consequence thereof would be death or great bodily harm to decedent. (2) and (3) the defendant's intention may have been arrived at through cool and calculated deliberation the same as in first

degree murder, but it would be sufficient if his plan was thought out beforehand the same as in (1) above without the cool, calculated consideration and clear understanding required for first degree murder. In all of these cases if the shooting was on a sudden quarrel or in the heat of passion, it would not be second degree murder. Thus, if defendant intentionally killed decedent pursuant to a previously thought out plan but lacked the cool, calculated deliberation, or the clear understanding required for murder in the first degree, or if he intentionally shot decedent intending only to do him great bodily harm, or not even intending to harm him but knowing that the natural and probable result of such shooting would be death or serious bodily harm to decedent, he was guilty of second degree murder. In second degree murder there may be an intention to kill and there must be either that or an intention to do great bodily harm or an intention to do an act knowing that the natural and probable consequence thereof will be death or great bodily harm. In any event, the intention and the act must have been previously planned and thought out beforehand and in case there is no intention to kill, the intention may be the result of cool and calculated deliberation, but where there is an intention to kill formed by cool and calculated deliberation then it is murder in the first degree.

Thus under the evidence here presented the jury could find either first or second degree murder or voluntary or involuntary manslaughter. Each of those crimes except involunatary manslaughter require either an intention to. kill or to do great bodily harm or an intention to do an act knowing death or great bodily harm will be the natural and probable result. In first degree murder under the evidence here presented an intention to kill the decedent arrived at by cool and calculated deliberation and a clear understanding of the nature of the act is necessary. In second degree murder there may be an intention to kill

and there must be either that or an intention to do great bodily harm or to do an act knowing that the natural and probable result thereof will be death or great bodily harm, and the intention as well as the doing of the act complained of must have been previously planned, designed or thought out beforehand, and in the last two instances may be the result of cool and calculated deliberation but, cool and calculated deliberation is never required for second degree murder.

In voluntary manslaughter there must be an intention to kill or do great bodily harm or to do an act knowing the natural and probable consequences thereof will be death or great bodily harm, but there is no requirement that such intention be formed or the action planned or thought out beforehand. On the contrary, it must be a sudden quarrel or in the heat of passion. In other words, the homicide in voluntary manslaughter must be the result of a sudden quarrel or great emotional upset so that the killing or the act causing the death, although intentional, was not the result of reasoning and controlled action but of sudden quarrel or violent emotion which deprives the killer of control over his actions.

There can be no possible self-executing standards by which the jury can accurately measure the emotions and intentions of the defendant. The dividing line between the different degrees of crime are often very indistinct. Pointing out the similarities and differences in the intentions and emotions necessary to constitute the various degrees of crime would greatly aid the jury to understand their task.

In view of all the circumstances, the fact that circumstances which would require a second degree murder verdict were not called to the jury's attention, that a human life is at stake, that the killing was the result of drinking, fighting and quarreling and there is much doubt whether the defendant or someone else actually did the shooting, I conclude that prejudicial error was committed and that there should be a new trial.

WOLFE, Justice (concurring in the result by special opinion).

I concur in the decision part of the opinion ordering a reversal and new trial, but I think my reasons are so different from those of the Chief Justice that I prefer to state them independently of the prevailing opinion.

There were no degrees of murder at common law. Most, if not all, of the states, including Utah, now have by statute separated the crime of murder into degrees. Section 103-28-3, U. C. A. 1943, and predecessor statutes, have divided first degree murder into four categories. These four categories were discussed at some length in *State* v. *Russell,* 106 Utah 116, 145 P. 2d 1003. For ready reference, I quote (with the addition of the numbers in parentheses) Section 103-28-3, U. C. A. 1943, which sets out the four categories of first degree murder and defines second degree murder.

"(1) Every murder perpetrated by poison, lying in wait or any other kind of willful, deliberate, malicious and premeditated killing; or

"(2) committed in the perpetration of, or attempt to perpetrate, any arson, rape, burglary or robbery; or

"(3) perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than the one who is killed; or

"(4) perpetrated by any act greatly dangerous to the lives of others and evidencing a depraved mind, regardless of human life; —is murder in the first degree.

"Any other homicide committed under such circumstances as would have constituted murder at common law is murder in the second degree."

The difficulty comes in second degree murder. The provision defining second degree murder is a residual provision. The first part of Section 103-28-3, picks out *some* of the killings which were murder at the common law and classifies them largely according to the mental element which attended the outward and visible element of the

crime. Having picked out *some* murders and set them off as *first degree* murders, the legislature placed all of the *other* killings which were committed *under such circumstances* as would have *constituted murder in the common law into a category designated as second degree murder.*

Within the residual provision of second degree murder fall killings which were committed in the act of perpetrating or attempting to perpetrate common law felonies, (at least those which were dangerous) except the four felonies of violence named in category (2) of first degree murder. For example, a killing committed while doing or attempting to do any of the following crimes, to wit, performing an illegal abortion, mayhem, kidnapping, assault with intent to do great bodily harm, etc.

"The rule of the common law was that when death occurred by the act of one who was in pursuit of an unlawful design, without any intention to kill it would be either murder or manslaughter, according to whether the intended offense was a felony or only a misdemeanor." See Sec. 74, Vol. 1, Permanent Edition, Warren on Homicide.

Whether a killing committed in the perpetration of a felony malum prohibitum rather than malum in se was murder in the common law is here unnecessary to determine. In Michigan it was held that

"death caused without intent after a sale of moonshine liquor, which sale was statutory felony, was not deemed murder for the reason that the sale was not an inherently dangerous common law felony." See Warren, Section 74, and *People* v. *Pavlic*, 227 Mich. 562, 199 N. W. 373, 35 A. L. R. 741.

Under our law, second degree murder would have to be a homicide committed under such circumstances as would have constituted murder at common law and not covered by the definition of first degree murder. Since to commit murder in the second degree there must be an unlawful killing of a human being with malice aforethought, the malice is shown by the pursuit of the unlawful design of committing a felony

other than the four specifically named felonies in category (2) of Section 103-28-3 at least common law felonies involving danger or violence. Of course the malice as to the four specific felonies named in category (2) was likewise supplied.

Also under our decisions those cases of homicide where there has not been the ability, absent insanity, to formulate a specific intent to kill fall under second degree murder. *State* v. *Stenback,* 78 Utah 350, 2 P. 2d 1050, 79 A. L. R. 878, (whether or not they will exactly fit the content of the residual provision of Section 103-28-3). Also under second degree murder fall those cases where extenuating circumstances attend the killing such as in the case of *State* v. *Anselmo,* 46 Utah 137, 148 P. 1071.

Cases where there is an intent to kill, but the intent is a sudden one or one which arises out of some sudden loss of emotional control, or is due to an ungovernable temper easily set off, but not attendant on a quarrel or arising from heat of passion when the provocation is not as considerable as is needed to reduce the crime to voluntary manslaughter, would fall under second degree murder. Also included in second degree murder are cases where there has been an intent to kill but not in cold blood and yet not in such hot blood as would make the killing a product of the passion which might bring it under voluntary manslaughter, but as expressed in *State* v. *Thompson,* 110 Utah 113, 170 P. 2d 153, in the "cool blood." The reasoning is that the elements of

" 'deliberate' and 'premeditated' not only negative the idea of hurried thoughtless action in the face of an unexpected situation, but reasonably imply some opportunity for careful thought and weighing of various considerations as well as the presence of some plan or design, though length of time available for deliberation is not the controlling element so much as is extent of the reflection, in which connection age and experience of defendant should be considered." *People* v. *Nichols,* 88 Cal. App. 2d 221, 198 P. 2d 538.

In this very recent California case of *People* v. *Nichols*, supra, a 13 year old girl with a mental age of 11 was mentally and emotionally defective and had a natural tendency of cruelty toward animals and was going through a period of extreme mental and emotional stress in the course of her physical development. She killed a girl of five years of age who resisted her attempts to engage the five year old in sex play.

In *People* v. *Bender*, 27 Cal. 2d 164, 163 P. 2d 8, 17, it was held that in a murder prosecution an instruction was erroneous which informed the jury that under certain circumstances killing is murder in the second degree unless

"the evidence proves the existence in the mind of the slayer of the specific intent to take life. If such specific intent exists at the time of such unlawful killing, the offense committed would of course be murder in the first degree."

because of the use of the quoted language since "specific intent" is not necessarily a willful, "deliberate" and "premeditated" intent which is essential to make homicide murder in the first degree.

It can be seen from the above that in second degree murder there may be but must not necessarily be the specific intent to kill and yet not under the circumstances with which the law intended to clothe first degree murder under category (1). Second degree murder has been used as a catch-all when the killing was not done upon a sudden quarrel or in the heat of passion, and thus was not voluntary manslaughter nor did not fit categories (2), (3) and (4) of Section 103-28-3, nor rise to the gravity of "deliberate" and "premeditated" murder specified in category (1).

Consequently, as a practical matter, it is necessary to define second degree murder in a negative way. What we should strive to achieve in the giving of instructions in murder cases is to convey to the jury in clear language the law applicable to the facts of the case which is presented to it

under all the theories which are reasonably tenable in view of the evidence. I think that the best way to do that is generally as follows: First, instruct the jurors as to the definition of murder which, of course, is defined as "the unlawful killing of a human being with malice aforethought." Then if the defendant is charged with first degree murder instruct them only as to the categories which, under the evidence, may be applicable. For instance, it would be foolish where the death was caused by sending the party poison candy by mail to instruct the jury on categories (2), (3) and (4). Category (1) could in such case be cut down to read "every murder perpetrated by poison" leaving out the remainder of category (1). Also, in such case, no choice should be left to the jury to find whether it was first or second degree murder. The only defense would be insanity; otherwise, it would be first degree murder in law. Of course, the jury could not be directed to find a verdict of guilty of first degree murder. See *State* v. *Kappel,* 53 N. Mex. 181, 204 P. 2d 443, where the Supreme Court of New Mexico pointed out under what circumstances an instruction on second degree murder would not be necessary. After the jury is instructed as to all the categories of first degree murder which under any theory could be reasonably applicable to the evidence, the judge should instruct that if the jury was not convinced beyond a reasonable doubt that the murder was first degree murder, but was convinced that the killing was done with malice aforethought as defined in its instructions relating to malice aforethought, the jury could find the defendant guilty of second degree murder. *State* v. *Kappel,* supra, presents a case wherein the court held that an instruction as to second degree murder could not be dispensed with because, under the evidence, the case was not one of first degree murder in law and hence the jury must be permitted to make the choice and thus must be instructed as to second degree murder. An examination of the evidence in that case emphasizes the simplicity and the practicality

of instructing the jury as to second degree murder in a negative fashion, i. e. if they find that the killing was not first degree murder according to one or more of the applicable categories of first degree murder in regard to which it has been instructed and yet they believe the killing was with malice aforethought, they should find the defendant guilty of murder in the second degree. Of course, if by any reasonable view of the evidence and inference therefrom, the jury acting as reasonable men could, if they failed to find the defendant guilty of first or second degree murder, find him guilty of voluntary or involuntary manslaughter, instructions as to the law of such homicides should be given.

The definition of murder in the second degree given by the lower court in this case was as follows:

"So far as you are concerned in the determination of this case, murder in the second degree is the unlawful slaying of a human being where the slayer before the commission of the act resulting in death had a specific design or intention thought out beforehand to cause great bodily injury to the deceased or an intention or design thought out beforehand to do an act knowing the reasonable and natural consequences thereof would be likely to cause great bodily injury to the deceased."

In so instructing, I am of the opinion that the trial court attempted to follow the reasoning of our decision in *State* v. *Russell* as he understood it. I believe, however, that he wrongly gained the impression from that case that one could not be guilty of second degree murder if the content of the malice included an intent to kill, but that it would then in all cases have to be first degree murder. This impression probably arose from the following language of the *Russell* opinion, to wit:

"As pointed out before, it is not necessary in order to commit murder in the second degree, to have a specific intention or design to kill. Under the facts and circumstances in this case all that is necessary in order to constitute murder in the second degree is that the defendant, when he struck the fatal blow, had a specific design

or intention, thought out beforehand, to cause great bodily injury to the deceased, or an intention or design thought out beforehand to do an act, knowing the reasonable and natural consequences thereof, would be likely to cause great bodily injury to the deceased. See authorities hereinabove cited on what constitutes murder. It was not necessary for the defendant to have a specific intention to kill the deceased in order to commit murder in the second degree and the court erred in instructing the jury that it was." 106 Utah 116, 145 P. 2d 1003, 1009.

Evidently the lower court thought the statement in the *Russell* case that

"it is not necessary in order to commit murder in the second degree, to have a specific intention or design to kill"

implied that if there was any intention to kill regardless of circumstances which preceded the actual killing it must necessarily be first degree murder. I do not think that this court in the *Russell* opinion so meant to hold. In *State* v. *Thompson,* 110 Utah 113, 170 P. 2d 153, 157, we recognized that there could be in second degree murder an intent to kill but not rising to the level of a premeditated intent or one which was reflected upon. It was there said,

"In the Russell case we did not emphasize the requirement [in first category of first degree murder] that there must be a cool and careful consideration of the intention to kill."

It was there stated:

"If murder in the first degree under this category requires a more cool consideration in forming the required plan, design and intention than does murder in the second degree, then it can be readily understood why the mind might be incapable of giving the required cool and calm consideration required for murder in the first degree under this category and still be capable of forming the necessary plan, design and intention to commit murder in the second degree. The fact that the term *deliberation* is used in defining murder in the first degree, and the fact that four terms are repeated one after the other with similar meaning indicates an intention to emphasize that there must be a cool, careful consideration of the plans before murder in the first degree under this category can be committed. We also held that there is no definitely fixed length of time required to ponder

or consider such question but there must be sufficient time under the circumstances of the case so that the defendant can formulate such plan, design and intention and cooly weigh and consider the same."

In the instant case there was a general melee in which four persons were involved. They had been drinking together sometime before and had separated and then came together again on Highway U-10. It is difficult to find a motive for Trujillo's killing of Lopez. Trujillo and Mondragon were in one car and Lopez, the deceased, and Herrera in the other car. Doubtless, the gun from which the fatal bullets were fired was thrown from the car occupied by Trujillo and Mondragon in an effort to get rid of incriminating evidence, and a story was concocted to establish an alibi. When that was found useless, they accused each other of the killing. While I think the conflict of evidence on the issue of whether Trujillo or Mondragon fired the shot could be resolved by the jury, perhaps to a point beyond a reasonable doubt, I note that Mondragon testified that he did not get out of Trujillo' car until he heard a shot fired and that then he saw Trujillo and Herrera talking. He has himself in Trujillo's car at the time the first shot was fired. He says that he then got out and that he passed Trujillo who was standing in front and to the left of the Lopez car; that after he passed the defendant he heard another shot which came from somewhere behind him and looked back and saw the defendant coming from the direction of the Lopez car.

Herrera said he did not see Lopez after the fight began. After he and Trujillo wrestled and Trujillo hit him in the stomach and while in the dizzy condition from that blow he heard a shot and judging from the flame from the gun it appeared to be directed toward him. He testified that he then heard two more shots and saw the defendant go from the Lopez car to his own car and get in it and drive away. Herrera corroborated Mondragon as to Trujillo's standing on the left and front of Lopez's car. Trujillo testified that Mondragon fired five shots from the gun which he had taken

from the glove compartment of defendant's car; upon hearing the shots he let go of Herrera and saw Lopez fall on the highway; that Mondragon called for him to leave whereupon he went to the car and drove away. It seems to me, under the evidence of the drinking and of the melee in the neighborhood of the two cars and conflicting evidence, that even if the jury concluded beyond a reasonable doubt, which evidently it did, that Trujillo committed the killing, the jury should have been given an opportunity to determine whether the killing did not fall under second degree murder. And for that purpose, the definition of second degree murder should not have been narrowed down to include only an intent to do great bodily harm but should have defined in terms of its residual aspects.

The court's instructions, I think, clearly state the law as to first degree murder applicable to this case, that is, the law as announced in category (1) of Section 103-28-3. By the alternates set out in Instruction No. 6, the court instructed not in the abstract as in Instruction No. 2, but in connection with supposed possible different theories under the evidence. My doubt is as to whether the evidence would be susceptible of a theory of deliberate killing under category (3) of Section 103-28-3. By instruction No. 7 the court in applying the definition of second degree murder given in Instruction No. 2 to the concrete evidence made the same mistake which I think was made in Instruction No. 2. He constricted the area of possible second degree murder in this case to the narrow question of whether the defendant shot Lopez with an intent to do great bodily harm or an intent to kill. This would introduce in many cases, if not in this one, a question which it would be most difficult to determine. Wharton in Vol. 1, Section 515—12th Edition, states,

"murder in the second degree includes *all* cases of common law murder where the intention was not to take life, of which murder, when the intent was only to do great bodily hurt *may be taken as the leading illustration.*" (Emphasis added.)

He thus made this only the *leading example* of those cases of felony at common law (exclusive of arson, burglary, rape and robbery) where a concomitant killing made such killing murder at common law. He does not balance on the knife edge of a mental element (the intent as to what the perpetrator wanted to accomplish) the question of whether the crime falls in first or second degree murder.

A man's life should not hang on what in many cases could be only a guess and the jury should not be confronted with the responsibility of making a guess where the consequences of the guess might be whether the accused lived or died. In this case the jury from the path into which the bullet was directed in the body might be able to infer that it was intended to accomplish death; that if the mental resolve were only to accomplish bodily harm it would not have been directed so accurately in the direction of the heart. An instruction which poises the question between murder in the first or second degree on the knife edge of the intent *as to desired accomplishment at the time of the assault* is too fine and narrow a one for the jury if it can be avoided. It is not like the question which the jury may be called upon to resolve whether, if there was an intent to kill, was it under such circumstances from which planning or premeditation could be inferred. The basis for an inference as to whether a killing was planned or premeditated is usually much broader than is the basis for drawing an inference as to whether the defendant at the moment of accomplishing the lethal blow intended to kill or only to do great bodily harm. The question posed by the court in its instruction defining second degree murder in this case turned not on whether the intent to kill was by premeditation or impulse but was a question of whether there was an intent to kill, the implication being that if there was, it was murder in the first degree; if not, but only an intention to accomplish great bodily harm, it was murder in the second degree.

Instead of instructing specifically as to what constituted second degree murder as far as the facts of this case were concerned, the court should have instructed that for the purposes of this case,

"Murder in the second degree is a homicide committed with malice aforethought but not falling under category (1) of the definition of first degree murder."

He should then have defined and explained malice aforethought as the same was defined and explained in *State* v. *Russell*. He should then have followed with the last paragraph of Instruction No. 7, to wit,

"If your minds are satisfied beyond a reasonable doubt that the defendant under all the facts and circumstances shown in evidence in this case committed murder as defined to you in these instructions, but entertain a reasonable doubt to which of the degrees of murder he is guilty, then you should find him guilty of murder in the second degree."

The instruction should have included the law as set out in category No. 1 of first degree murder and then proceeded to inform the jury that as far as the facts of this case were concerned if the homicide was committed under such circumstances as would have not constituted murder in the first degree but still with malice aforethought, it would in this case be second degree murder, thus narrowing the question down to merely that of determining whether Trujillo, if it concluded that he did the shooting, had done so with a premeditation required by the first category of Section 103-28-3 and that if not, the jury must determine whether it was second degree murder. From this point the court could have proceeded with his instructions on voluntary and involuntary manslaughter as he did.

The court stated in its Instruction No. 1 that

"*The human mind acts with celerity which is sometimes impossible to measure* and whether there is a deliberate and premeditated design to kill must be determined from all the facts and circumstances of the case." (Emphasis ours.)

This dilutes to a degree, at least, the emphasis which the law places on the element of deliberation and premeditation in first degree murder. Somewhat similar language was used in *State* v. *Anselmo,* supra. This court there said,

"under our statute, therefore, it is not sufficient that the killing of a human being be intentional and deliberate, but to constitute murder in the first degree * * * the killing must be premeditated." [46 Utah 137, 148 P. 1077.]

The trial judge there had instructed that an act can be premeditated within a space of time so brief that the human mind cannot appreciate it nor grasp its duration. Such said this court "seems confusing, to say the least." That statement was specifically disapproved in the *Anselmo* case. In that case this court reviewed cases which approved such expressions and also cases in which such expressions were criticized and disapproved. The matter above italicized in the court's instruction in this case appears in the excerpt which Mr. Justice Frick approved as correctly stating the law in this jurisdiction. He stated

"no attempt should be made to fix any definite space of time which is necessary to constitute the premeditation required by our statute."

Yet it would seem that such attempt is embraced within the words "the human mind acts with celerity which is sometimes impossible to measure" bringing into this case the very idea that the *Anselmo* case repudiated. I think this language is unfortunate, but I do not think that in itself it is prejudicial because it was accompanied by that part of Instruction No. 2 which stated that

"to constitute murder in the first degree it must appear that such time elapsed before delivering the blow resulting in death as was sufficient for some reflection and consideration upon the matter of choice to kill or not to kill and for the formation of a definite purpose to kill."

However, I do not think it should be used hereafter.

I conclude with a recapitulation, to wit,

(1)   At common law there were no degrees of murder. These were introduced by statute.

(2)   The legislature set out four categories constituting murder in the first degree depending on the circumstances preceding or surrounding the killing and differentiated largely by the mind state of the person who perpetrated the murder.

(3)   After carving out from all murders these four categories and designating them as murders in the first degree where the penalty prescribed was death, there were other types of killing at common law attended by malice aforethought which remained uncategorized but which did not arise to the level of severity of first degree murders. These the legislature lumped together as second degree murders although the circumstances under which they could be committed varied as widely or more widely in type than did first degree murders. For these murders the legislature prescribed punishment of a period of years up to life.

(4)   While theoretically the criterion for determining if a murder in the second degree has been committed is the touchstone of whether it would have been a murder at common law not covered by the categories of first degree murder, there were fact situations on the borderline dividing these two degrees where the killing might or might not have been done with intent to kill. And if there was an intent to kill it may have been on impulse or under circumstances which precluded on the one hand its being planned or premeditated and yet, on the other hand, not entirely actuated by such strong emotions generated out of a sudden and intense quarrel or heat of passion as to say that these emotions rather than a reasoning mind motivated the killing. Or the mind may not have had at the time of the killing the capacity to form an intent to kill. Or because of extenuating, mitigating or background circumstances the

crime did not raise to a level where it would fall into any of the first degree murder categories. And yet in this in-between zone, killings may have been accompanied or actuated by malice aforethought either of the constructive type which is constructed out of the unlawful design to commit a common law felony or by the implied or express malice defined in Section 103-28-2, U. C. A. 1943, but not showing the animus or perfidy or conscious disregard for human life as characterizes categories (1), (3) and (4) of Section 103-28-3. (first degree murders.)

(5) The very difficulty of determining in borderline cases whether the murder would fall in one or more of the categories of first degree or in the category of second degree murder (because of extenuating or background circumstances or circumstanes which would make most difficult any refined appraisal or whether the crime was committed on a sudden impluse to kill or with a deliberate or premeditated intent to kill) make it advisable to leave to the common sense of the jury under the guidance of instructions as above suggested, the decision in these borderline cases as to whether the animus or malice chargeable to the killer should place it in the class of first degree murder or in the class of residual murders known as second degree murders without any attempt to encompass the comprehensive nature of second degree murder except in terms of its residual aspects.

(6) Hence, if the jury is instructed as to the categories of first degree murder applicable, and as to what constitutes malice in murder cases, and then instructed that if the jury finds it to be murder it must determine whether it falls in any of the categories of first degree murder as defined in the instructions, and if not, that it will then fall into the residual category known as second degree murder, the jury will be relieved of some of the difficulties involved in this subject. Of course, if the killing falls in neither category of murder, it may, if the evidence under any

reasonable theory is susceptible of fitting into such theory be found to be voluntary, and in some cases even involuntary, manslaughter in which cases the jury should be instructed as to the definition and law applicable to such killings.

It follows from what was said above that I concur with the decision part of the opinion in the order for reversal and a new trial.

McDONOUGH, Justice (concurring).

I concur in the result and generally in the reasoning in the opinion of Mr. Chief Justice PRATT. I also concur in the opinion of Mr. Justice WOLFE.

LATIMER, Justice (dissenting).

I dissent.

I suppose that when a man's life is at stake every reasonable safeguard should be erected to protect his innocence. However, the erection of barriers should not destroy the practical enforcement of the law and make it next to impossible to prosecute those who kill. The trial of a murderer is a practical business, controlled by legislative enactments which prescribe indistinct refinements, and directed by individuals who are not omniscient. Judges are mortal and instructions are difficult to conceive and prepare. Most judges are not able to submit letter-perfect instructions, eliminate every inaccuracy, or group words and phrases together with such consumate skill that an appellate court can not find some reversible error. The most, I believe, we can require is that a judge must instruct a jury in such a way that improper elements can not be molded together as a basis for an erroneous conviction. Not only do trial judges have difficulty in properly cataloguing the degrees of murder and properly enumerating the elements that go with each class, but this court has found it arduous and

troublesome to point out the differences and lay down principles which will assist trial judges in future cases. I mention this because today's opinion seems to me to add confusion rather than clarity to what is a befuddled state of the law. By this decision we not only overrule what I believe to be the holding and result in *State* v. *Russell,* 106 Utah 116, 145 P. 2d 1003, but, in addition, we appear to misinterpret the common law.

As outlined in the opinion of the Chief Justice and the concurring opinions of Mr. Justice WADE and Mr. Justice WOLFE, this killing was the aftermath of a drinking party. Due in part to the condition of the participants, a clear picture of what transpired is not disclosed. Criminations and recriminations are involved, but, if the jurors chose to believe the circumstances and evidence which were not too much warped by interest or intoxication, they could find beyond a reasonable doubt that the deceased, without any provocative act on his part, was run off the road by the defendant, that defendant got out of his car with a loaded weapon, walked back, after making certain threats to shoot and becoming involved in an altercation shot deceased twice while deceased was sitting in his automobile. A clear-cut motive for the shooting was not shown, but there must have been some reason or excuse as the deceased was killed under facts and circumstances which do not permit a finding that he shot himself.

In view of the state of the evidence and the circumstances pointing towards the defendant as the wrong-doer, the trial judge apparently decided to instruct in accordance with his understanding of the principles of law as announced by this court in the case of *State* v. *Russell,* supra. He must have further decided to apply these principles to the facts before him and not submit to the jury abstract propositions of law. In so doing I believe he complied with the admonitions repeatedly given by this court.

In *State* v. *Thompson*, 110 Utah 113, page 131, 170 P. 2d 153, page 162, Mr. Justice Wade, speaking for the court, said:

"Defendant urges that the court erred in giving general abstract instructions, using ancient and highly technical legal terms not understood by laymen, giving instructions which had no application to the facts in this case, and in not applying the law to the facts which were supported by the evidence, and that the jury was probably misled thereby and the case should be reversed on that account. We have repeatedly criticized the giving of abstract statements of the law to the jury, and held that it is the duty of the court to apply the law to the facts supported by the evidence and to not instruct on any question which is not involved in the case under the evidence."

I need not cite other cases to the effect that the trial judge should mold his instructions to fit the facts, as this court has on many occasions castigated trial judges for giving instructions dealing with abstract propositions of law and the two concurring justices in this case make mention of the principle that the instructions should blend themselves into the facts disclosed by the evidence.

The record establishes that there were two slugs which entered the body of the deceased, and, according to the doctor's testimony, either could have been fatal. The trial judge, in carving out his instructions, concluded that there were three possible ways in which the evidence indicated the deceased might have been shot: The first possibility was that the defendant fired the two shots while standing near the automobile; the second possibility was that the one shot was fired accidently and while the defendant was scuffling with Herrera and the second shot was fired into the body of the deceased after the defendant proceeded over to the car; the third possibility was that the defendant intended to shoot Herrera or Mondragon and in firing at them he shot and killed the deceased. He, therefore, fashioned each instruction on murder and manslaughter to fit the three assumed possibilities.

In view of the results reached by the majority, the only question of importance therefore becomes did the trial judge carve out an erroneous instruction on second degree murder? I first desire to mention that I do not find a single request for any instruction and I do not find any exception to a given instruction which would in any way apprise the trial judge of any error relied on by members of this court to reverse the conviction. Again, with life in the balance, these omissions should not be overlooked if the errors made by the trial court were apparent, significant and such that a juror might be misled, but the defects we point out were not apparent to counsel of many years experience and the members of this court have encountered difficulty in deciding the nature, extent and effect of the claimed error. The distinctions between murder in the first and second degrees are subtle and baffling to both jurors and judges and in this case they fade into nothing. Only by the barest of possibilities might some juror have been misled.

I do not completely quote all of the instruction given by the court on first and second degree murder as some of the omitted paragraphs deal with the same offense, provided, the jury found the defendant shot only once with intent to kill or intent to do great bodily harm instead of twice. The court in defining malice, deliberation and similar terms gave the following instructions:

"The criminal code of this State defines murder as the unlawful killing of a human being with malice aforethought. So far as you are concerned in a determination of this case, murder in the first degree is an unlawful, wilfull, deliberate, and premeditated killing with malice aforethought. The terms, 'aforethought, premeditation, and deliberation,' mean to think out, plan or design beforehand. The term, 'deliberation,' has the additional quality or meaning of planning or designing in a cool state of the blood or mind. The term, 'unlawful,' means without legal excuse or justification. The term 'wilfull,' implies simply a purpose or willingness to commit the act or make the omission referred to. It does not require any intent to violate law or to injure another or to acquire any advantage.

"To have the malice necessary to constitute murder in the first degree the slayer must before the commission of the act or acts re-

sulting in the death of the deceased have deliberately and premeditatedly formed a specific intention or design to kill the person slain; * * , * ."

The instruction on first degree murder, with omissions immaterial to this decision, is as follows:

"If your minds are satisfied beyond all reasonable doubt that the Defendant while standing near the automobile of the deceased fired two shots into the body of the deceased, and that the deceased died as a result of the wounds so inflicted, and if your minds are further satisfied beyond all reasonable doubt that at the time such shots were fired the Defendant acted wilfully and with deliberate and premeditated design to kill said Max Lopez, and if such design or intent was formed before the firing of such shots, then by your verdict you should find the Defendant guilty of murder in the first degree."

It will be observed that the definition as used is couched in the exact words of category (a) of Section 103-28-3, U. C. A. 1943, later quoted and that malice includes a specific design or intent to kill.

Construed together and removed from the realm of the abstract, as the last one is, these instructions correctly state the law of first degree murder. I believe all members of the court agree with that statement. By the verdict it returned in conformity with these instructions the jury must have found that at least one of the shots was fired by the defendant while he was acting maliciously, wilfully, in a cool state of blood, with a deliberate and premeditated design to kill, and with such design and intent formed prior to the time the shot was fired. But other members of the court say the jurors might not have reached the same decision had they known that the same elements might be the basis for a verdict of second degree murder. Even though such an assumption is speculative, and the elements of the two graduations are not the same, I believe it can be established that the jury was informed in substance it could return a verdict of the lesser offense of second degree mur-

der if the standards necessary to convict for first degree murder were not met by the state.

I would concur with the other members of the court if I were of the opinion that intent to kill was always a component of second degree murder or that it was an essential element in this case. But, as I read and understand the authorities, at common law intent to kill was not necessary to establish murder and this included all murders as there were no degrees. Mr. Warren, in his text on Homicide, Vol. 1, paragraph 65, states the common law rule and its later statutory modifications to be as follows:

"Necessity for Intent.—By the common law, an unlawful killing with malice aforethought, even though the manifest intent or purpose was to do simply a bodily harm, but not to take life, constituted murder. *Therefore purpose or intent to kill does not constitute an essential ingredient in the crime of murder by the common law. The necessity for intent to kill as an element in the crime of murder, depends, to a great extent, upon the wording of the statutes, in the several jurisdictions and the construction thereof by the particular state courts.*"

Mr. Wharton's 12th edition of Criminal Law is in substantial agreement with the statement hereinabove quoted. In paragraph 502 of his work the following statement may be found:

"According to the older common-law authorities, not only was it murder to kill another, though the intent was merely to severely hurt, but it was considered murder if homicide were unintentionally committed by a person when engaged in a collateral felony. It is true that so long as all killing incidental to a felonious purpose was punishable with death there was no practical call for a classification of such killings. *But when under humaner auspices it was felt that death should only be assigned as a punishment to homicides specifically and maliciously intended, it was found necessary to distinguish between this class of murders and murders in which there was no such intent.* It was for this purpose that legislative action was invoked. The statute, however, in which the distinction first found formal expression was not a law imposed by the legislature of the people, but a law which had grown into practical acceptance with the people, and had then been put into technical shape by the legislature. Juries for generations had refused to convict for murder

unless a specific intent to take life had been shown; or, if they did convict, when there was no such proof, it was with a recommendation to mercy, which withdrew from the sentence at least the incident of punishment by death."

It is conceded by practically all authorities that the reasons for gradations of murder was to adopt more humane methods of dealing with individuals who committed murders of a less aggravated type and to permit the exaction of the death penalty only for the perpetrators of murders which could be catalogued as savage, inhuman, brutal, or aggravated. It must have been with this thought in mind that our legislature concluded to prescribe for degrees of murder. To accomplish this the legislature adopted what is now Section 103-28-3, U. C. A. 1943. I quote this section but in so doing sub-divide the section and idtentify the different classes of first degree murder by inserting small letters:

"(a) Every murder perpetrated by poison, lying in wait or any other kind of willful, deliberate, malicious and premeditated killing [is murder in the first degree]; or

"(b) committed in the perpetration of, or attempt to perpetrate, any arson, rape, burglary or robbery; or

"(c) perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than the one who is killed; or

"(d) perpetrated by any act greatly dangerous to the lives of others and evidencing a depraved mind, regardless of human life; —is murder in the first degree.

"Any other homicide committed under such circumstances as would have constituted murder at common law is murder in the second degree."

The provisions of subsection (a) of this section make it apparent that the legislature included in the category of first degree murder those which were wilfull, deliberate, malicious and premeditated, and, by implication, excluded them from the second degree murder category. If the facts

were such that the murder met those standards then the legislature concluded that the penalty for first degree murder should be imposed. Conversely, if the elements of wilfullness, deliberation, maliciousness and premeditation were not present, but other elements at common law which were not enumerated were present, then the offense was to be scaled down to the crime of second degree murder. Even when classifying the most aggravated types of killings as murders in the first degree, the legislature did not prescribe that the element of intent to kill must always be present in first degree murder. It can be included as an element if the facts justify its prescription, but even then, to sustain a conviction, it must be preceded or accompanied by deliberation, premeditation and malice. If intent to kill was not necessary in common law murder and it is not an essential element in some of the first degree murder offenses mentioned in Section 103-28-3, U. C. A. 1943, the legislature could not have intended to include it as a necessary and essential element in every second degree murder. The illustration of killing while committing an abortion used by Mr. Justice WOLFE aptly portrays a case of second degree murder where the offender did not intend to kill, rather, he intended not to kill.

This court not only recognized that intention to kill is not a necessary component in murder, but we went much further when in the case of *State* v. *Russell*, supra, we held that it was prejudicial error for the judge to include intent to kill as a necessary part of murder in the second degree.

I quote from that case, page 126 of 106 Utah Reports, page 1007 of 145 P. 2d:

"It is universally recognized, under such statutory provisions and the common law, that a specific intention or design to kill is not necessary in order to commit murder. All that is required is that the killing be unlawful and that it be done with *malice aforethought.* It is the *malice* which is required to have been thought out beforehand, and not the killing."

Again at page 131, 106 Utah Reports, at page 1009 of 145 P. 2d:

"As pointed out before, it is not necessary in order to commit murder in the second degree, to have a specific intention or design to kill. Under the facts and circumstances in this case all that is necessary in order to constitute murder in the second degree is that the defendant, when he struck the fatal blow, had a specific design or intention, thought out beforehand, to cause great bodily injury to the deceased, or an intention or design thought out beforehand to do an act, knowing the reasonable and natural consequences thereof, would be likely to cause great bodily injury to the deceased. See authorities herein above cited on what constitutes murder. It was not necessary for the defendant to have a specific intention to kill the deceased in order to commit murder in the second degree and the court erred in instructing the jury that it was."

It is interesting to note that this court reverses the present conviction because the judge failed to include or mention intent to kill in his charge for second degree murder, while, in that case, we reversed the conviction because of prejudicial error in including intent as an element of second degree murder. I quote from page 132, 106 Utah Reports, page 1010 of 145 P. 2d:

"By instructions 9 and 10 the jury was told that before they could find the defendant guilty of murder in the first or second degree they must find that he had an intention or design to kill the deceased. If the jury followed these instructions and were satisfied that the defendant when he struck the deceased had previously formed an intention to kill her he was not prejudiced because under such circumstances he was guilty of murder in the first degree. *On the other hand it might well be that had the court expressly told the jury that murder committed with the intention to kill under the circumstances of this case is murder in the first degree but such murder committed without that intention is only murder in the second degree that the jury might have concluded that the defendant had no such intention and found him only guilty of murder in the second degree, whereas this distinction not being expressly pointed out, the jury might have, without giving that question particular attention found him guilty of murder in the first degree.* In view of the fact that the evidence tends to show no intention to kill this was prejudicial error."

If intention to kill is not a requirement in every charge of second degree murder I am unable to find anything in this record which would justify a reversal because the court did not include it in the instructions dealing with that degree of murder. There are only six hypotheses which the trial judge could reasonably find were within the limits of the evidence. They were: (1) the shooting was deliberate, premeditated, malicious and with intent to kill deceased; (2) the shooting was deliberate, premeditated and with intent to do great bodily injury to deceased; (3) the shooting was done in the heat of passion engendered by a fight; (4) the shooting was done without specific intent because of intoxication; (5) the shooting was accidental; and (6) the shooting was done by some one other than the defendant. The court instructed on all these hypotheses.

In defining the crime of second degree murder, the manner in which the trial judge fitted it to the evidence is shown by his definition and his subsequent instructions. The definition as given by the court is as follows:

"So far as you are concerned in a determination of this case, murder in the second degree is the unlawful slaying of a human being where the slayer before the commission of the act resulting in death had a specific design or intention thought out before hand to cause great bodily injury to the deceased or an intention or design thought out before hand to do an act knowing the reasonable and natural consequences thereof would be likely to cause great bodily injury to the deceased."

The instruction on second degree murder, with unimportant deletions, provides as follows:

"If you entertain a reasonable doubt as to whether the Defendant committed murder in the first degree but your minds are satisfied beyond all reasonable doubt that the Defendant while standing near the automobile of the deceased fired two shots into the body of the deceased and that the deceased died as a result of the wounds so inflicted, and if your minds are further satisfied beyond all reasonable doubt that at the time of the firing of such shots the Defendant acted wilfully and with the deliberate and premeditated design to do Max Lopez great bodily harm and that such design or intent

was formed before the firing of such shot, then you should find the Defendant guilty of murder in the second degree."

If there is any way by which a court could assume another hypothesis for second degree murder which would include the intent to kill then it could only be by an assumption that the evidence touching on malice, premeditation, or deliberation was not sufficient to justify a conviction of first degree murder. There is no evidence to justify such an assumption as the record does not disclose that time or defendant's mental condition did not permit premeditation or deliberation and there is no evidence by which the court could conclude the malice necessary for first degree murder was diluted or lessened. This is not to say that under our system a jury could not find that some of the elements were not established to their satisfaction beyond a reasonable doubt, but this is quite a different principle from the duty of the judge to so instruct.

I am at a loss to determine how a trial judge could instruct as to the quantum of malice, deliberation or premeditation except in the manner the trial judge used in this case. If intent to kill must be kept in instructions dealing with both first and second degree murder then the court must in some way instruct the jurors that if the killing was not so malicious, so deliberate, or so premeditated as to amount to first degree murder, then the jury should find the defendant guilty of second degree murder. Of course, the quantity of malice, deliberation and premeditation are not matters which can be accurately delineated by words. These can only be sufficient or insufficient to sustain a conviction for first degree murder when the jurors are either convinced beyond a reasonable doubt or not convinced that the state has produced the quality and quantity of evidence necessary for a conviction.

It is my belief that simplification, understanding and practicability dictate that the jury be given a positive in-

struction as to all elements necessary to constitute the crime of first degree murder, and then a positive instruction on those essential elements of second degree murder made necessary by the facts of the case; that those cases which may not fit the pattern of first degree murder because of being less brutal or savage be controlled by the instruction which is given in every murder case and which permits the latitude sought by members of this court. The trial judge twice instructed the jurors as to their duties if there was any reasonable doubt as to whether all elements of the crime of first degree murder had been proven beyond a reasonable doubt.

Instruction No. 7 commences as follows:

"If you entertain a reasonable doubt as to whether the Defendant committed murder in the first degree * * * then you should find the defendant guilty of murder in the second degree."

and ends as follows:

"If your minds are satisfied beyond a reasonable doubt that the Defendant under all the facts and circumstances shown in evidence in this case committed murder as defined to you in these instructions, but entertain a reasonable doubt as to which of the degrees of murder he is guilty, then you should find him guilty of murder in the second degree."

The foregoing paragraphs seem to me to be the residual clauses which permit the jury to graduate malice, passion, premeditation, wilfullness, intent and other elements up and down the criminal scale. This seems more desirable than to have the court submit two instructions for seperate graduations of murder each including as an element "intent to kill." I would permit the court to set up the standards for the gravest of all murders and then in effect say to the jury,

"If the evidence does not quite reach the standards prescribed for the major degree you should convict of the lesser degree."

This would allow the jurors to determine the guilt of the accused, grade the offense in accordance with its barbarity, savagery, and maliciousness, or temper their verdict because of influences bearing on defendant's state of mind at the time of the killing and yet prevent minor imperfections in instructions from freeing criminals who richly deserve punishment.

I would be much more inclined to concur in an opinion which held that the state had not established the defendant committed the crime of first degree murder beyond a reasonable doubt. If the evidence is sufficient to sustain the conviction then the instructions could not be prejudicial. The admonishment given by the court to the effect that the jurors should not find the defendant guilty of first degree murder if they entertained a reasonable doubt as to whether the killing was wilfull, deliberate and premeditated operated to cure any error of omission assuming the presence of one. The jury was fully instructed as to the meaning of the terms wilful, unlawful, premeditation, deliberation and malice. The definitions given by the court informed the jury that before the verdict of guilty of murder in the first degree could be rendered the defendant must have formed a specific intention or design to kill, must have thought out the plan beforehand, must have conceived the plan in a cool state of blood or mind, and must have killed without legal excuse or justification. Every element of first degree murder was specifically enumerated and specifically defined and the jury, by its verdict, found that all were present beyond a reasonable doubt. If the necessary malice, premeditation and deliberation were present, as found by the jury, then the element of intent to kill would make the offense first degree murder. If those elements were not present then the jury was duty-bound to follow the instruction given by the court and reduce the crime to second degree murder, regardless of defendant's intent.

As I understand the other opinions, if there was an error the same was an error of omission, that is, the instruction as given on second degree murder was not erroneous but it should have gone further and suggested to the jury that if they found the shots were fired with intent to kill or with intent to do bodily harm it could return a verdict of second degree murder. Being only an error of omission, it is my contention that the instructions as given adequately presented to the jury the element other members of the court feel was omitted.